1   ZACHARY PEKELIS JONES, WSBA #44557
    BRIAN H. ROWE, WSBA #56817
2   CRISTINA SEPE, WSBA #53609
    Assistant Attorneys General
3   JEFFREY T. EVEN, WSBA #20367
    Deputy Solicitor General
4   800 5th Avenue, Ste. 2000
    Seattle, WA  98104
5   (206) 474-7744

6

7               **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF WASHINGTON**
8                        **AT YAKIMA**

9   ENRIQUE JEVONS, as managing          NO. 1:20-cv-03182-SAB
    member of Jevons Properties LLC,
10  et al.,                              DEFENDANTS'
                                         OPPOSITION TO
11              Plaintiffs,              PLAINTIFFS' MOTION FOR
                                         SUMMARY JUDGMENT
12      v.                               AND CROSS-MOTION FOR
                                         SUMMARY JUDGMENT
13  JAY INSLEE, in his official
    capacity of the Governor of the      NOTED FOR: July 1, 2021 at
14  State of Washington, et al.          1:30 pm

15              Defendants.              *With Oral Argument*

16

17

18

19

20

21

22

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 3

      A.  The COVID-19 Pandemic and Washington's Response ..................... 3

      B.  The Risk and Costs of Mass Evictions ...................................... 4

      C.  The State Eviction Moratorium .............................................. 5

      D.  The Safe Start Plan, Temporary Restrictions, Healthy
          Washington Plan, and Vaccination Campaign ............................. 7

      E.  The Pandemic's Ongoing Impacts ........................................... 8

      F.  Federal, State, and Local Rental Assistance Measures ................. 9

      G.  The CDC Eviction Moratorium ............................................. 12

      H.  The Landlords and Their Lawsuit .......................................... 14

III.  ARGUMENT ................................................................................. 15

      A.  Summary Judgment Legal Standard ....................................... 15

      B.  The Court Lacks Subject Matter Jurisdiction .......................... 15

          1.  The Landlords do not have standing ................................ 15

          2.  The Landlords' challenge is imminently moot ................... 17

          3.  The Eleventh Amendment bars the claims against
              the Governor ......................................................... 18

          4.  The Court lacks jurisdiction to enjoin purported
              violations of the Washington Constitution ..................... 19

      C.  The Moratorium Does Not Effect an Unconstitutional Taking ....... 20

          1.  The Moratorium does not authorize "permanent occupation"
              of Landlords' properties ........................................... 21

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

2. Physical takings do not apply to interests in rental agreements ...... 25

3. The State is not confiscating security deposits ............................... 26

4. Equitable remedies are unavailable ................................................... 27

D. The Moratorium Does Not Violate the Takings Clause of the
Washington State Constitution ................................................................ 28

E. The Moratorium Comports with the Contracts Clause .......................... 31

1. The Moratorium does not impose a substantial, unforeseeable
impairment on rental agreements .................................................... 32

a. The Moratorium does not undermine the contractual bargain . 32

b. The Moratorium does not impair reasonable expectations ....... 36

c. The Landlords may safeguard or reinstate their rights ............. 38

2. The Moratorium advances a significant public purpose in an
appropriate and reasonable way ....................................................... 39

a. The Moratorium's purpose is significant and legitimate .......... 39

b. The Moratorium is reasonable and appropriate ....................... 41

3. This Court should follow *El Papel* and other the federal courts
that have upheld eviction moratoria ................................................. 44

F. The Moratorium Does Not Violate Substantive Due Process ............... 45

1. The Moratorium is a rational and legitimate ................................... 45

2. The void for vagueness doctrine is not applicable .......................... 48

3. The Landlords cannot repackage their other claims into a Due
Process Clause claim ....................................................................... 49

G. Declaratory Relief Under § 1983 Should Be Denied ............................ 50

IV. CONCLUSION ............................................................................................ 50

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
## TABLE OF AUTHORITIES

2
<u>Cases</u>

3
*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
   No. 20-cv-03377 (DLF), 2021 WL 1779282 (D.D.C. May 5, 2021),
4
   *granting stay pending appeal*,
   2021 WL 1946376 (D.D.C. May 14, 2021) ............................................. 13, 16
5

*Already, LLC v. Nike, Inc.*,
6
   568 U.S. 85 (2013) ...................................................................................... 17

7
*Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*,
   No. CV 20-05193, 2020 WL 6700568 (C.D. Cal. Nov. 13, 2020) .............. 3, 31
8

*Arkansas Game & Fish Comm'n v. United States*,
9
   568 U.S. 23 (2012) ................................................................................. 23, 24

10
*Armstrong v. United States*,
   364 U.S. 40 (1960) ...................................................................................... 27
11

*Auracle Homes, LLC v. Lamont*,
12
   478 F. Supp. 3d 199 (D. Conn. 2020) .................................................... passim

13
*Baptiste v. Kennealy*,
   490 F. Supp. 3d 353 (D. Mass 2020) ..................................................... passim
14

*Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*,
15
   941 F.3d 1195 (9th Cir. 2019) ..................................................................... 17

16
*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ..................................................................................... 48
17

*Bronson v. Kinzie*,
18
   42 U.S. 311 (1843) ....................................................................................... 34

19
*Brown v. Azar*,
   No. 20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ................... 14
20

*Brown v. Legal Found. of Wash.*,
21
   538 U.S. 216 (2003) ..................................................................................... 26

22

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Chambless Enterprises, LLC v. Redfield*,
   No. 20-CV-01455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) ...................... 14

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,
   819 F.2d 732 (7th Cir. 1987) ............................................................... 37

*Cienega Gardens v. United States*,
   331 F.3d 1319 (Fed. Cir. 2003) .................................................... 25, 26

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) .................................................................... 15, 16

*Connolly v. Pension Benefit Guar. Corp.*,
   475 U.S. 211 (1986) ............................................................................ 41

*County of Butler v. Wolf*,
   No. 2:20-cv-677, 2020 WL 2769105 (W.D. Pa. May 28, 2020)...................... 28

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998)............................................................................. 46

*Cummings v. DeSantis*,
   No. 2:20-CV-351-FtM-38NPM,
   2020 WL 4815816 (M.D. Fla. Aug. 19, 2020).................................... 17

*Doe v. Va. Dep't of State Police*,
   713 F.3d 745 (4th Cir. 2013) .............................................................. 16

*El Papel LLC v. Inslee*, No. 2:20-CV-01323-RAJ-JRC,
   2020 WL 8024348 (W.D. Wash. Dec. 2, 2020),
   *report and recommendation adopted*,
   2021 WL 71678 (Jan. 8, 2021) ....................................................passim

*Elmsford Apt. Assocs., LLC v. Cuomo*,
   469 F. Supp. 3d 148 (S.D.N.Y. 2020) ..........................................passim

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
   459 U.S. 400 (1983)........................................................ 36, 40, 41

*Ex Parte Young*,
   209 U.S. 123 (1908)............................................................................ 18

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*FCC v. Fla. Power Corp.,*
   480 U.S. 245 (1987).................................................................................21

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012)...........................................................................48, 49

*Ferguson v. Skrupa,*
   372 U.S. 726 (1963).................................................................................46

*Fikre v. FBI,*
   904 F.3d 1033 (9th Cir. 2018) ................................................................18

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County,*
   482 U.S. 304 (1987).................................................................................24

*Goldblatt v. Town of Hempstead,*
   369 U.S. 590 (1962).................................................................................46

*Granat v. Keasler,*
   99 Wn.2d 564 (1983)...............................................................................29

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972)...........................................................................48, 49

*Gregory Real Estate & Mgmt. v. Keegan,*
   No. CV2020-007629 (Super. Ct. of Ariz. July 22, 2020) .......................21

*HAPCO v. City of Philadelphia,*
   482 F. Supp. 3d 337 (E.D. Pa. 2020)................................................passim

*Heights Apts., LLC v. Walz,*
   No. 20-CV-2051, 2020 WL 7828818 (D. Minn. Dec. 31, 2020)..............passim

*Hendler v. United States,*
   952 F.2d 1364 (Fed. Cir. 1991) ..............................................................24

*Hodel v. Indiana,*
   452 U.S. 314 (1981).................................................................................47

*Home Bldg. & Loan Ass'n v. Blaisdell,*
   290 U.S. 398 (1934)...............................................................................passim

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*JL Props. Grp. B, LLC v. Pritzker*,
   No. 20-CH-601 (12th Cir. Ct., Will Cnty., Ill. July 31, 2020) ........................ 21

*Johnson v. Murphy*,
   No. 20-CV-06750, 2021 WL 1085744 (D.N.J. Mar. 22, 2021) ...................... 3

*Kawaoka v. City of Arroyo Grande*,
   17 F.3d 1227 (9th Cir. 1994) .................................................................. 45, 46

*Knick v. Twp. of Scott, Penn.*,
   139 S. Ct. 2162 (2019) ................................................................................. 28

*L.A. Cnty. Bar Ass'n v. Eu*,
   979 F.2d 697 (9th Cir. 1992) ...................................................................... 18

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005) ..................................................................................... 46

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ............................................................. 2, 21, 22, 24

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 16

*MacEwen v. Inslee*,
   No. C20-5423, 2020 WL 4261323 (W.D. Wash. July 24, 2020) .................... 19

*Matorin v. Commonwealth of Massachusetts*,
   No. 2084CV01334 (Mass. Super. Ct. Aug. 26, 2020) ...................................... 21

*Matsuda v. City and County of Honolulu*,
   512 F.3d 1148 (9th Cir. 2008) ..................................................................... 31

*Penn Central Transp. Co. v. New York City*,
   438 U.S. 104 (1978) ..................................................................................... 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ................................................................................ 19, 20

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*,
   467 U.S. 717 (1984) ..................................................................................... 47

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Planned Parenthood of Idaho, Inc. v. Wasden*,
  376 F.3d 908 (9th Cir. 2004) ..................................................................... 19

*Rental Housing Ass'n v. City of Seattle*,
  No. 20-2-13969-6 SEA (King Cnty., Wash. Super. Ct. Feb. 24, 2021) ........... 21

*Richardson v. City & County of Honolulu*,
  124 F.3d 1150 (9th Cir. 1997) .................................................................. 46

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) (per curiam) ............................................................ 39

*Rubinovitz v. Rogato*,
  60 F.3d 906 (1st Cir. 1995) ..................................................................... 48

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ............................................................................... 28

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020) ...................................................................... 41, 42

*San Francisco Apt. Ass'n v. City & County of San Francisco*,
  No. CPF-20-517136 (Cal. Super. Ct. Aug. 3, 2020) .................................... 21

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ................................................................................. 18

*Skyworks, Ltd. v. CDC*,
  No. 20-CV-2407, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021) ..................... 13

*Sofamor Danek Group, Inc. v. Brown*,
  124 F.3d 1179 (9th Cir. 1997) .................................................................. 18

*Spokane School Dist. No. 81 v. Parzybok*,
  96 Wn.2d 95 (1981) ................................................................................ 30

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
  560 U.S. 702 (2010) ........................................................................ 3, 48, 49

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) .......................................................... 31, 32, 38, 39

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002).................................................................21, 24, 26

*Terkel v. CDC*,
    No. 20-CV-00564, 2021 WL 742877 (E.D. Tex. Feb. 25, 2021) ....................13

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*,
    No. 20-CV-02692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021) ..............13

*Tohono O'odham Nation v. Ducey*,
    130 F. Supp. 3d 1301 (D. Ariz. 2015) ...........................................................19

*Trump v. Hawaii*,
    138 S. Ct. 377 (2017)......................................................................................17

*U.S. Trust Co. of New York v. New Jersey*,
    431 U.S. 1 (1977)......................................................................................32, 38

*Va. Office for Prot. & Advocacy v. Stewart*,
    563 U.S. 247 (2011)........................................................................................18

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)........................................................................................47

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
    449 U.S. 155 (1980)........................................................................................26

*Workman v. Mingo Cnty. Bd. of Educ.*,
    419 F. App'x 348 (4th Cir. 2011) ...................................................................39

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)......................................................................22, 23, 25, 30

*Yim v. City of Seattle*,
    194 Wn.2d 651 (2019)...............................................................................29, 30

<u>Constitutional Provisions</u>

U.S. Const. amend. V ...............................................................................passim

U.S. Const. amend. XI ......................................................................................19

U.S. Const. amend. XIV.................................................................2, 3, 45, 50

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

viii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

U.S. Const. art. I, § 10 ................................................................................ passim

U.S. Const. art. III ..................................................................... 15, 16, 17

Wash. Const. art. I, § 16 ................................................................. 2, 19, 29

<u>Statutes</u>

American Rescue Plan Act of 2021,
    Pub. L. No. 117–2, 135 Stat. 4 (2021) ........................................... 11

Consolidated Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) .................................. 13

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116–136, 134 Stat. 281 (2020) ................................ 9, 10

2021 Wash. Sess. Laws, ch. 115 ............................................... 11, 12, 17

2021 Wash. Sess. Laws, ch. 3 ............................................................ 10

2021 Wash. Sess. Laws, ch. 334 ....................................................... 10

RCW 38.52.050 ..................................................................................... 4

RCW 43.06.220 ................................................................................... 20

RCW 59.12 ......................................................................................... 37

RCW 59.18 ......................................................................................... 37

RCW 59.18.060 ................................................................................... 37

RCW 59.18.140 ................................................................................... 37

RCW 59.18.170 ................................................................................... 37

RCW 59.18.200 ................................................................................... 37

RCW 59.18.257 ................................................................................... 37

RCW 59.18.260 ............................................................................. 27, 37

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

ix

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

RCW 59.18.270 ..................................................................................... 37

RCW 59.18.280 ............................................................................... 27, 37

RCW 59.18.365–.410 ........................................................................... 37

RCW 59.18.410 ..................................................................................... 38

Regulations

85 Fed. Reg. 55,292 (Sept. 4, 2020)................................................ 12, 13

86 Fed. Reg. 16731-01 (Mar. 31, 2021) ................................................ 13

86 Fed. Reg. 21163 (Apr. 22, 2021) ...................................................... 40

86 Fed. Reg. 8020-01 (Feb. 3, 2021) ..................................................... 13

Rules

Fed. R. Civ. P. 56(a).............................................................................. 15

Other Authorities

Engrossed Second Substitute S.B. 5160,
    67th Leg., Reg. Sess. (Wash. 2021)................................................ 11

Engrossed Substitute H.B. 1368,
    67th Leg., Reg. Sess. (Wash. 2021)................................................ 10

Engrossed Substitute S.B. 5092,
    67th Leg., Reg. Sess. (Wash. 2021)................................................ 10

Tenants Union of Wash. State, *Tenant Screening*,
    https://tenantsunion.org/rights/tenant-screening .............................. 49

Wash. Office of the Governor,
    Proclamation 20-19.6 (Mar. 18, 2021) ......................................passim

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

x

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## I.    INTRODUCTION

The COVID-19 pandemic, the deadliest in over a century, has created both a public health crisis and an economic crisis. Over 5,600 Washingtonians have died from COVID-19 and there have been over 424,000 confirmed and probable cases in the State. And because of the pandemic and the measures necessary to fight it, more than 1.6 million Washingtonians have filed unemployment claims and more than 180,000 have lost their jobs. The State has experienced the worst economic devastation since the Great Depression.

Governor Inslee has issued emergency proclamations to slow COVID-19's spread and mitigate its economic hardships. Like the federal government and many other states, the Governor issued a moratorium on most residential evictions (the Moratorium). Recognizing that the pandemic would leave many tenants in financial distress and at risk of eviction, the Governor sought to keep people in their homes during this public health emergency. Evictions force people into congregate settings, like homeless shelters and shared living quarters, where COVID-19 spreads most aggressively. Without the Moratorium, as many as 789,000 Washingtonians would be at risk of eviction. Epidemiological modeling projects that mass evictions on that scale could cause up to 59,000 more COVID-19 infections and 621 more deaths in the State. The Moratorium helps mitigate these unacceptable losses.

Plaintiffs Enrique Jevons, Jevons Properties LLC, Freya Burgstaller, and Jay and Kendra Glenn (the Landlords) have tenants owing unpaid rent. Wishing to evict their tenants during the pandemic, the Landlords filed this lawsuit, alleging that the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  Moratorium violates the Contracts, Takings, and Due Process Clauses of the U.S.

2  Constitution, and the Contracts Clause of the Washington State Constitution.

3      The Landlords' claims fail for several reasons. Jurisdictional bars, including

4  lack of standing, mootness, and sovereign immunity, foreclose the Landlords' claims.

5  The relief sought by the Landlords would not redress their purported injuries because

6  the federal eviction moratorium also blocks them from evicting their tenants for non-

7  payment. The Moratorium will end on June 30, 2021, by operation of statute, mooting

8  the Landlords' request to enjoin it. And this Court cannot enjoin the Governor

9  because he does not have a "fairly direct" connection to enforcement; nor can the

10 Court enjoin the Governor and the Attorney General based on violations of state law.

11     On the merits, Defendants Inslee and Ferguson (hereinafter, the State) are

12 entitled to summary judgment on the Landlord's constitutional claims against the

13 Moratorium. Concerning the Landlords' Takings Clause claims, the Moratorium is

14 not a physical taking—that is, "the permanent occupation of [a] landlord's property

15 by a third party." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440

16 (1982). Regarding the Contracts Clause, the U.S. District Court for the Western

17 District of Washington has already concluded that the landlords in that case were

18 unlikely to succeed on their claim that the Moratorium violates the Contracts Clause.

19 *El Papel LLC v. Inslee*, No. 2:20-CV-01323-RAJ-JRC, 2020 WL 8024348, at *12

20 (W.D. Wash. Dec. 2, 2020), *report and recommendation adopted*, 2021 WL 71678

21 (Jan. 8, 2021) (explaining the Moratorium is a "reasonable and appropriate"

22 mechanism "designed to address vital public interests during a national public

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

crisis"). Finally, the Landlords' Due Process Clause challenge fails because the Moratorium is rationally related to the goals of keeping tenants in homes and curbing the transmission of COVID-19. The Landlords also do not identify a property interest independent of the interests addressed by their Takings and Contracts claims. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 721 (2010).

The Moratorium is a critical—and constitutionally appropriate—tool to mitigate the pandemic's catastrophic economic and public health impact. The Landlords' claims all fail as a matter of law. The Court should grant summary judgment in the State's favor, following *El Papel*, 2020 WL 8024348, and every other federal court of which the State is aware that has considered—and rejected—constitutional challenges against COVID-19 eviction moratoria.[1]

## II.   FACTUAL BACKGROUND

### A.   The COVID-19 Pandemic and Washington's Response

The SARS-CoV-2 virus that causes COVID-19 is highly contagious and

---

[1] *Johnson v. Murphy*, No. 20-CV-06750, 2021 WL 1085744 (D.N.J. Mar. 22, 2021); *Heights Apts., LLC v. Walz*, No. 20-CV-2051, 2020 WL 7828818 (D. Minn. Dec. 31, 2020); *Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*, No. CV 20-05193, 2020 WL 6700568 (C.D. Cal. Nov. 13, 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass 2020); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337 (E.D. Pa. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199 (D. Conn. 2020); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020).

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  potentially fatal. Declaration of Dr. Scott W. Lindquist ¶¶ 7–9. Seniors and persons
2  with medical conditions are most vulnerable to complications and death, and people
3  of color disproportionately contract and experience severe COVID-19 health
4  outcomes. *Id.* ¶¶ 8–11. The virus spreads primarily through close interactions via
5  respiratory droplets. *Id.* ¶ 7. There is a lag of several days before the onset of
6  symptoms, and some with COVID-19 experience no symptoms. *Id.*

7  On February 29, 2020, the Governor issued Proclamation 20-05, declaring a
8  State of Emergency in Washington due to COVID-19. Declaration of Kathryn
9  Leathers ¶ 4, Ex. A; *see* RCW 38.52.050. With few proven therapeutics and no
10 vaccine, a primary strategy to slow COVID-19's spread was to minimize interactions
11 outside one's household. Lindquist Decl. ¶¶ 16, 18, 20. The State's mitigation
12 measures grew stricter as cases and deaths accelerated. *Id.* In March 2020, the
13 Governor required people to cease leaving their homes except for essential activities
14 and essential business. Leathers Decl., Ex. C.

15 **B.     The Risk and Costs of Mass Evictions**

16 From the outset of the pandemic, the Governor's Office understood that the
17 pandemic would significantly reduce economic output and income, making many
18 tenants unable to afford rent. *See* Declaration of Jim Baumgart ¶ 8. A homelessness
19 and housing instability crisis predated the pandemic in the State, where 21% of
20 tenants were extremely low-income and affordable housing stock declined by one-
21 third since 2012. *Id.*, Exs. A, E. Between 2013 and 2017, over 130,000 Washington
22 adults faced an eviction, and by 2018 homelessness reached Great Recession levels.

1  *Id.*, Ex. E. An analysis of Seattle unlawful detainer cases showed that most evictions

2  result in homelessness, with only 12.5% of evictees finding another home.

3  Declaration of Cristina Sepe, Ex. A at 3.

4   Against that backdrop, the Governor's Office anticipated that, without

5  countermeasures, the COVID-19 pandemic's economic dislocations would result in

6  mass evictions, exacerbating housing instability and homelessness in Washington.

7  Baumgart Decl. ¶ 8, Ex. J at 3. Mass evictions would imperil both the economy and

8  public health. *Id.* ¶ 8. Mass evictions would not only displace people from their

9  residences at the very time that it was critical to stay home, but also force many into

10  congregate settings like shelters and over-occupied homes, further spreading

11  COVID-19. *Id.*; Lindquist Decl. ¶¶ 19, 54–58. Residential crowding and increased

12  contact increase the risk of COVID-19 infections. *See* Lindquist Decl. ¶¶ 54–58, 62,

13  Ex. J–M. The Washington Department of Health (DOH) has identified 202 COVID-

14  19 outbreaks in homeless services or shelters. Lindquist Decl. ¶ 58, Ex. N at 4. The

15  Governor's Office also recognized that allowing evictions would flood the state court

16  system with unlawful detainer filings, forcing tenants to risk their health to appear in

17  housing courts that are crowded even in normal times. Baumgart Decl. ¶ 19. For those

18  reasons and others, it is unsurprising that a rise in evictions, and the lifting of their

19  moratoria, has been found to lead to significant increases in COVID-19 infections

20  and deaths. Baumgart Decl. ¶ 10, Ex. S; Lindquist Decl. ¶¶ 60–62, Exs. O–Q.

21  **C.**  **The State Eviction Moratorium**

22   Given the likelihood and obvious dangers of mass evictions amidst the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

COVID-19 pandemic, on March 18, 2020, Governor Inslee issued Proclamation 20-19, temporarily prohibiting most residential evictions. Leathers Decl., Ex. B. Correctly predicting COVID-19 to "cause a sustained global economic slowdown," the Governor logically determined that "the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes," which in turn would "increas[e] the life, health, and safety risks to a significant percentage of our people from the COVID-19 pandemic." *Id.* Originally set to expire on April 17, 2020, the Moratorium has been amended and extended several times as the pandemic and recession persisted. It is currently set to expire on June 30, 2021. Leathers Decl. ¶ 23; Wash. Office of the Governor, Proclamation 20-19.6 (Mar. 18, 2021) (attached as Leathers Decl., Ex. M).

In crafting amendments to the Moratorium, the Governor's Office sought input from many stakeholders, including residential property owners, managers, and landlords (collectively, property owners). Leathers Decl. ¶ 19; Baumgart Decl. ¶¶ 15–17. Based on their input, the Governor added several exceptions to protect property owners and induce tenants able to pay rent to do so.

In its current form, the Moratorium prohibits property owners from pursuing eviction unless: (1) it is "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident;" (2) the landlord intends to "personally occupy the premises as a primary residence" (with timely notice to the tenant); or (3) the landlord intends to "sell the property" (also with timely notice). Procl. 20-19.6.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Property owners sought a mechanism to collect unpaid rent during the Moratorium. Baumgart Decl. ¶ 17. As amended, the Moratorium provides one. Though it generally prohibits landlords from treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," that prohibition applies only when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020." Procl. 20-19.6. Thus, the Moratorium permits action other than eviction to collect unpaid rent that predated or is unrelated to the pandemic. The Moratorium also permits a landlord to collect *any* unpaid rent if a tenant refuses or fails to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident." *Id.* The Moratorium does not forgive any debt of unpaid rent and stresses that tenants "who are not materially affected by COVID-19 should and must continue to pay rent." *Id.*

**D.    The Safe Start Plan, Temporary Restrictions, Healthy Washington Plan, and Vaccination Campaign**

On May 4, 2020, the Governor set forth a four-phase "Safe Start" reopening plan. Leathers Decl., Ex. D. After a surge in cases, in mid-July the Governor paused the plan and extended the Moratorium until October 15, 2020. *Id.* In response to the fall surge, on November 17, 2020, the Governor set new temporary restrictions on in-person gatherings, businesses, and other activities statewide. *Id.*, Ex. E.

On January 11, 2021, the Governor implemented a new phased reopening plan to replace the temporary restrictions, the Healthy Washington Plan, which divided counties into eight regions. Leathers Decl. ¶ 12, Exs. F, G. All regions began in Phase 1

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

of the Healthy Washington Plan, the most restrictive phase. *Id.* On February 14, the West region moved to Phase 2. On March 11, the Governor announced a statewide move to Phase 3, effective March 22. Leathers Decl. ¶ 25. On May 13, 2021, after observing that a "fourth wave" of COVID-19 infections was in decline, the Governor announced that the State is moving toward a statewide June 30, 2021, reopening date and that all counties in Washington are in Phase 3 of the Healthy Washington Plan effective May 18 until June 30, 2021. Sepe Decl. ¶ 4, Ex. C.

The Food and Drug Administration has authorized three vaccines for Emergency Use Authorization. Lindquist Decl. ¶ 14. Vaccines are critical to reducing COVID-19 case numbers and controlling the pandemic. Sepe Decl., Ex. B. Through the State's vaccination campaign, more than 6.4 million vaccine doses have been administered and 59.2% of the population over the age of 16 have received at least one dose of the vaccine. *See id.*, Ex. D. But only 47.6% of the 16 and over population is fully vaccinated, and there is wide variability among our counties. *See id.*, Exs. D, E, F. There is light at the end of this pandemic tunnel, though vaccine hesitancy may pose an obstacle to achieving threshold herd immunity. *Id.*, Exs. G, H.

**E.     The Pandemic's Ongoing Impacts**

During the pandemic, at least 18,000 more Washingtonians have had to rely on cash assistance and 160,000 more on food assistance. Baumgart Decl., Ex. I. Over 1.6 million Washingtonians have filed unemployment claims, and the State's unemployment rate has exceeded its Great Recession peak. Baumgart Decl. ¶ 7. Through the first four months of this year, over 265,000 *new* unemployment claims

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

were filed, showing that the jobs crisis persists more than a year after COVID-19 cases first emerged here. *Id.* ¶ 7, Ex. I; Sepe Decl., Ex. I.

With the economy's continuing fragility, housing instability remains a significant concern. According to recent Census survey data, 10.7% of renters in Washington (160,080 people) are behind on their rent. Baumgart Decl., Ex. Z. And 17.8% of renters (265,342 people) reported having little or no confidence in their ability to make rent. *Id.* An analysis by the Aspen Institute found that 649,000 to 789,000 people in Washington (up to 10.3% of the population) would be at risk of eviction without the Moratorium. Baumgart Decl., Ex. N at 8.

The consequences of such mass evictions would be catastrophic. They would result in—according to projections performed by the University of Washington Institute for Health Metrics and Evaluation—between 18,235 to 59,008 more eviction-attributable COVID-19 cases, 1,172 to 5,623 more hospitalizations, and 191 to 621 more deaths in the State. Declaration of Dr. Christopher J. L. Murray, Ex. B.

**F.      Federal, State, and Local Rental Assistance Measures**

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which included $150 billion in direct assistance for state, territorial, and tribal governments. Pub. L. No. 116–136, 134 Stat. 281 (2020). From this fund, in early August 2020, Washington allocated more than $100 million in Eviction Rent Assistance Program (ERAP) grants. Baumgart Decl. ¶ 12. Administered by local community organizations, ERAP funds provide up to three months of rent assistance to property owners on an eligible tenant's behalf. *Id.*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Cities and local authorities may run their own rental assistance programs, including as encouraged through certain tax programs under state law. *Id.* The CARES Act also imposed a 120-day national moratorium on evictions of renters participating in federal housing assistance programs or living in a property with a federally backed mortgage. Pub. L. No. 116–136, § 4024, 134 Stat. 281, 492–93 (2020). The CARES Act moratorium expired on July 24, 2020.

In February 2021, the Legislature adopted—and the Governor signed into law—a $2.2 billion COVID relief bill. *See* Engrossed Substitute H.B. 1368, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 3. The bill provided the Department of Commerce $325 million to administer an emergency rental and utility assistance program, which provides grants to local housing providers. *Id.*, § 3(1). The relief package also sent $40 million toward other housing programs, including grants to local housing providers, *id.* § 3(2), mortgage assistance for homeowners facing foreclosure, *id.*, § 3(3), and grants to landlords who have lost "rental income from elective nonpayor tenants during the state's eviction moratorium," *id.*, § 3(7). The Governor also proposed rent assistance funds of $163 million in the 2021 supplemental budget and $152 million in 2022. Baumgart Decl. ¶ 13. And the State's operating budget appropriates $658 million to the Department of Commerce to administer rental and utility assistance. Engrossed Substitute S.B. 5092, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 334; Baumgart Decl. ¶ 14.

In March 2021, Congress enacted the American Rescue Plan Act of 2021. Pub.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   L. No. 117–2, 135 Stat. 4 (2021). The legislation gives more than $21.5 billion in

2   rental assistance to help millions of families keep up on their rent and remain in their

3   homes and $5 billion to assist people at risk of or experiencing homelessness.

4        In April 2021, the Washington Legislature adopted—and the Governor signed

5   into law—a bill that provides tenant protections during and after this current public

6   health emergency.[2] Under the bill, the eviction moratorium instituted through

7   Proclamation 20-19.6 ends on June 30, 2021. Engrossed Second Substitute S.B. 5160,

8   67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 115. The

9   law requires that if a tenant has remaining unpaid rent that accrued between March 1,

10  2020, and the later of the end of the public health emergency or December 30, 2021,

11  a landlord must offer that tenant a reasonable plan for rent repayment whose monthly

12  payments cannot exceed one-third of the monthly rent during the period of non-

13  payment. *Id.*, § 4. But if that tenant "fails to accept the terms of a reasonable

14  repayment plan within 14 days of the landlord's offer," the landlord may pursue an

15  unlawful detainer action, subject to any requirements of the Eviction Resolution Pilot

16  program. *Id.* If a tenant defaults on rent owed under a repayment plan, the landlord

17  may apply for reimbursement from the Landlord Mitigation Program or proceed with

18  an unlawful detainer action, subject to any requirements of the Eviction Resolution

19  Pilot program. *Id.* The court must consider in the unlawful detainer proceeding the

20  tenant's circumstances, including any decreased income or increased expenses due

21

22
_____

[2] The Governor partially vetoed two sections. *See* Leathers Decl., Ex. Q.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

to COVID-19, and the repayment plan terms offered. *Id.* The landlord's failure to offer a reasonable repayment plan is a defense to an unlawful detainer action. *Id.*

The law additionally provides that landlords are eligible to file certain reimbursement claims under the Landlord Mitigation Program up to $15,000 for unpaid rent that accrued between March 1, 2020, and December 30, 2021. *See id.*, § 5. It also requires that the Administrative Office of the Courts contract with Dispute Resolution Centers to establish court-based eviction resolution pilot programs. *Id.*, § 7. It also provides for court-appointed counsel for indigent tenants in unlawful detainer proceedings, subject to the availability of amounts appropriated. *Id.*, § 8.

## G.    The CDC Eviction Moratorium

On September 4, 2020, the U.S. Centers for Disease Control & Prevention (CDC) adopted a nationwide eviction moratorium. 85 Fed. Reg. 55,292 (Sept. 4, 2020). The CDC found eviction moratoria are "an effective public health measure" that prevent the spread of disease by "facilitat[ing] self-isolation" and by allowing states "to more easily implement stay-at-home and social distancing directives[,]" and recognized that "housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, . . . put[ting] individuals at higher risk to COVID-19." *Id.*

The CDC moratorium prohibits property owners from evicting tenants who attest that they (1) have used "best efforts" to obtain government rent or housing assistance; (2) expect to earn no more than $99,000 in annual income in 2020; (3) are unable to pay full rent due to substantial loss of income, reduced hours or wages, a

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
2

lay-off, or medical expenses; (4) are "using best efforts to make timely partial payments" in light of "other nondiscretionary expenses"; and (5) would likely be rendered homeless or forced to "live in close quarters in a new congregate or shared living setting" if evicted. *Id.* at 55,293. It does not apply wherever a state or local government's eviction moratorium provides "the same or greater level of public-health protection." *Id.* at 55,294. It has been extended and modified and is currently set to expire on June 30, 2021. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 502, 134 Stat. 1182, 2078–79 (2020); 86 Fed. Reg. 8020-01, 8,021 (Feb. 3, 2021); 86 Fed. Reg. 16731-01 (Mar. 31, 2021).[3]

---

[3] Recently, a court vacated the CDC moratorium, holding that the CDC exceeded the statutory authority given to it by Congress in issuing the moratorium, but stayed its order pending appeal. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 20-cv-03377 (DLF), 2021 WL 1779282, at *10 (D.D.C. May 5, 2021), *granting stay pending appeal*, 2021 WL 1946376 (D.D.C. May 14, 2021). Two other courts have held that the same but that an injunction was inappropriate. *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*, No. 20-CV-02692, 2021 WL 1171887, at *10 (W.D. Tenn. Mar. 15, 2021); *Skyworks, Ltd. v. CDC*, No. 20-CV-2407, 2021 WL 911720, at *13 (N.D. Ohio Mar. 10, 2021); *see also Terkel v. CDC*, No. 20-CV-00564, 2021 WL 742877, at *2 (E.D. Tex. Feb. 25, 2021) (CDC moratorium exceeds the government's Commerce and Necessary but no injunction). Two courts have upheld the CDC moratorium. *Chambless Enterprises, LLC v.*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## H. The Landlords and Their Lawsuit

The Landlords filed this lawsuit in October 2020. The Landlords filed an Amended Complaint in May 2021, dropping the Contracts Clause claim under the state constitution. *See* ECF No. 27.

Enrique Jevons is governor of Jevons Properties LLC, which owns or manages nearly 800 units in Washington. ECF No. 26 ¶ 2; *see also* Sepe Decl., Ex. M. Jevons declares that he has 171 tenants who are not current with their rent. ECF No. 26 ¶ 3. He states he has referred tenants to nonprofit agencies to seek rental assistance but has declined funding through the Washington State Department of Commerce. *Id.* ¶ 8. Some tenants have received rental assistance from the Opportunities Industrialization Center of Washington, Salvation Army, and other entities. Sepe Decl., Ex. N at 11–12.

Freya K. Burgstaller is the trustee of a trust that owns 12 rental units in Yakima County. ECF No. 25 ¶ 3. Burgstaller declares she has two tenants who owe back rent, including one who has owed rent since before the pandemic, but does not state whether she has offered her tenants any type of repayment plan. *Id.* ¶¶ 4–6.

Jay and Kendra Glenn own 46 residential properties in Yakima County, which they rent to tenants at "lower than market rents." ECF No. 24 ¶ 2. Their property

---

*Redfield*, No. 20-CV-01455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) (CDC moratorium did not exceed statutory authority); *Brown v. Azar*, No. 20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) (same).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MSJ NO. 1:20-cv-03182-SAB

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1 manager declares that 29 tenants owe back rent. *Id.* ¶ 4. He has referred tenants to
2 nonprofit agencies to seek rental assistance and had previously asked tenants to pay
3 one twelfth of the past due balance each month. *Id.* ¶ 6.

4 The Landlords do not state they have offered, and their tenant have refused, a
5 "reasonable repayment plan," which would enable the Landlords to treat any unpaid
6 rent as an enforceable debt under the Moratorium. Procl. 20-19.6. The Landlords'
7 declarations provide no information on their tenants' income, employment status,
8 financial circumstances, family obligations, or other ways in which the pandemic
9 may have affected their lives. They do not adduce sufficient evidence revealing
10 whether their tenants would qualify under the CDC moratorium, which would
11 independently preclude the Landlords from evicting them.

12 ## III. ARGUMENT

13 ### A. Summary Judgment Legal Standard

14 Summary judgment is appropriate when "the movant shows that there is no
15 genuine dispute as to any material fact and the movant is entitled to judgment as a
16 matter of law." Fed. R. Civ. P. 56(a).

17 ### B. The Court Lacks Subject Matter Jurisdiction

18 #### 1. The Landlords do not have standing

19 The CDC moratorium leaves the Landlords without Article III standing to
20 challenge the Moratorium. Article III standing is designed "to prevent the judicial
21 process from being used to usurp the powers of the political branches." *Clapper v.*
22 *Amnesty Int'l*, 568 U.S. 398, 408 (2013). The "standing inquiry" is "'especially

PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  rigorous when reaching the merits of the dispute would force [a court] to decide

2  whether an action taken by'" another branch of government is unconstitutional. *Id.*

3  The Landlords fail to meet this "'especially rigorous'" standard.

4      To have Article III standing, the Landlords must demonstrate "as an irreducible

5  minimum" that they have suffered (1) an injury in fact that is (2) "fairly traceable" to

6  the challenged laws, and that is (3) "likely to be redressed by the requested relief."

7  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992) (cleaned up). The

8  traceability and redressability elements are not met "when there exists an

9  unchallenged, independent rule, policy, or decision that would prevent relief even if

10  the court were to render a favorable decision." *Doe v. Va. Dep't of State Police*, 713

11  F.3d 745, 756 (4th Cir. 2013).

12      If the Moratorium was enjoined, the CDC moratorium would apply in

13  Washington.[4] While the CDC moratorium protects a narrower subset of tenants, the

14  Landlords have not argued that their tenants could not meet the CDC's requirements

15  to avoid eviction. The CDC moratorium expires on June 30, 2021, so an injunction

16  would leave the Landlords in the same position they are in now—unable to

17  commence eviction proceedings at least until the federal moratorium expires. The

18  Landlords do not argue that the CDC moratorium poses no obstacle to their abilities

19  to evict tenants for nonpayment. The Landlords lack standing.

20  _____

21      [4] The court that vacated the CDC moratorium has stayed the order pending

22  appeal. *Ala. Ass'n of Realtors*, 2021 WL 1946376, at *5.

## 2. The Landlords' challenge is imminently moot

The Moratorium will end on June 30, 2021, *see* 2021 Wash. Sess. Laws, ch. 115, § 4(1)—mooting the Landlords' requests for declaratory and injunctive relief. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Courts "treat the voluntary cessation of challenged conduct by government officials with more solicitude than similar action by private parties." *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (cleaned up). "For this reason, the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal." *Id.* This principle applies to the expiration of executive actions. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (per curiam) (dismissing as moot a challenge to an executive order's provisions that had "'expired by [their] own terms'"); *Cummings v. DeSantis*, No. 2:20-CV-351-FtM-38NPM, 2020 WL 4815816, at *3 (M.D. Fla. Aug. 19, 2020) (claims mooted by replacement COVID-19 orders).

No live controversy will remain when the Moratorium ends on June 30, 2021. The Legislature has passed, and the Governor has signed, a robust statutory scheme guiding landlord-tenant relationships affected by the COVID-19 pandemic. *See* 2021 Wash. Sess. Laws, ch. 115. This legislation is the result of substantial deliberation among policymakers and stakeholders and not an attempt to manipulate jurisdiction.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*See Fikre v. FBI*, 904 F.3d 1033, 1038 (9th Cir. 2018) ("The rigors of the legislative process bespeak finality and not for-the-moment, opportunistic tentativeness.") (cleaned up). And the 2021 legislative session has concluded—further cementing the Moratorium's ending date. Rather than give an advisory opinion on the Moratorium's constitutionality, the Court should dismiss the Landlords' claims as moot.

### 3.    The Eleventh Amendment bars the claims against the Governor

A third barrier to the Landlords' challenge to the Moratorium is the "jurisdictional bar of the Eleventh Amendment[,]" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996), which prohibits "federal courts from hearing suits brought by private citizens against state governments without the state's consent[,]" *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997). The narrow exception articulated in *Ex Parte Young*, 209 U.S. 123, 157 (1908), permits suits for prospective injunctive relief against state officials only if they have a proven connection to enforcing the challenged law. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). The connection "must be fairly direct"; "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision" does not suffice. *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

The *Ex parte Young* exception does not apply as to Governor Inslee because he does not have a "fairly direct" connection to enforcement of the Moratorium. Under state law, the Governor has authority to issue an emergency proclamation, but enforcement power lies with others. If an official "cannot direct, in a binding fashion,

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution, he may not be a proper defendant." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). "Were the law otherwise, the exception would always apply[]" and "[g]overnors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*." *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015). As a court noted in holding Governor Inslee immune from a suit seeking to enjoin other COVID-19 proclamations, "'[t]he power to promulgate law is not the power to enforce it.'" *MacEwen v. Inslee*, No. C20-5423, 2020 WL 4261323, at *2 (W.D. Wash. July 24, 2020) (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (holding same with respect to Texas governor's COVID-19 orders)). The Landlords' claims against the Governor must be dismissed.

**4. The Court lacks jurisdiction to enjoin purported violations of the Washington Constitution**

The Court lacks jurisdiction over the Landlords' claim that the Moratorium violates the Takings Clause of article I, § 16 of the Washington State Constitution. Based on the doctrine of state sovereign immunity and principles of federalism embodied in the Eleventh Amendment, a federal court lacks jurisdiction to enjoin a state official's actions on the basis that the official has violated state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *id.* at 104 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

In *Pennhurst*, the Supreme Court held that federal courts could not grant relief against state officials for their purported violations of state law, because doing so would not "vindicate the supreme authority of federal law." 465 U.S. at 106.[5] Under *Pennhurst*, this Court lacks jurisdiction to resolve the Landlords' claim that the Moratorium violates the state constitution. Other federal courts have rejected challenges by plaintiffs seeking redress from federal courts for grievances against moratoria that were grounded in state law. *Heights Apts.*, 2020 WL 7828818, at *7; *Elmsford*, 469 F. Supp. 3d at 161–62; *Auracle Homes*, 478 F. Supp. 3d at 219.

**C.     The Moratorium Does Not Effect an Unconstitutional Taking**

The Landlords' second claim that the Moratorium constitutes a physical taking in violation of the Fifth Amendment fails. Because regulation of the landlord-tenant relationship that falls short of a permanent physical occupation is not a physical taking, every court to consider takings claims against state or local eviction moratoria during the COVID-19 pandemic has rejected them.[6] This Court should too.

---

[5] A federal court may intervene when a state official is acting *ultra vires*, meaning that he or she "acts without any authority whatever." *Pennhurst*, 465 U.S. at 101 n.11 (cleaned up). But the Landlords do not argue that the Governor acted without any authority whatsoever. Nor could they, given the Governor's emergency powers under RCW 43.06.220.

[6] *See, e.g.*, *Baptiste*, 490 F. Supp. 3d at 388–90; *HAPCO*, 482 F. Supp. 3d at 358; *Auracle Homes*, 478 F. Supp. 3d at 220–21; *Elmsford*, 469 F. Supp. 3d at 164;

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

### 1. The Moratorium does not authorize "permanent occupation" of Landlords' properties

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. There are two general categories of takings: physical takings and regulatory takings. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002).

The Landlords contend that the Moratorium "fall[s] squarely within the 'physical occupation' line of cases[.]" ECF No. 22 at 7. But Supreme Court has made clear that a physical taking occurs when the government subjects a property owner to a "*permanent* physical occupation" of the owner's property. *Loretto*, 458 U.S. at 435 (emphasis added). The Court expressly denied that this "physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships." *Id.* at 440; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not *per se* takings"). That "broad" power is perfectly compatible with the *Loretto* rule so

_____

*Rental Housing Ass'n v. City of Seattle*, No. 20-2-13969-6 SEA (King Cnty., Wash. Super. Ct. Feb. 24, 2021); *Matorin v. Commonwealth of Massachusetts*, No. 2084CV01334 (Mass. Super. Ct. Aug. 26, 2020); *San Francisco Apt. Ass'n v. City & County of San Francisco*, No. CPF-20-517136 (Cal. Super. Ct. Aug. 3, 2020); *JL Props. Grp. B, LLC v. Pritzker*, No. 20-CH-601 (12th Cir. Ct., Will Cnty., Ill. July 31, 2020); *Gregory Real Estate & Mgmt. v. Keegan*, No. CV2020-007629 (Super. Ct. of Ariz. July 22, 2020).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MSJ NO. 1:20-cv-03182-SAB

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

long as the government does not compel "the permanent occupation of the landlord's property by a third party." 458 U.S. at 440. The Moratorium falls outside that "very narrow" rule, *id.* at 441, as cabined by this seminal case.

If *Loretto* had left any doubts that landlord-tenant regulations fall outside the physical occupation rule, the Court dispelled them in *Yee v. City of Escondido*, 503 U.S. 519 (1992). In *Yee*, mobile home park owners challenged an ordinance that, along with a state law, prevented them from either "set[ting] rents," "decid[ing] who their tenants will be," "evict[ing] a mobile home owner," or "easily convert[ing] the property to other uses." *Id.* at 526–27. This made "the mobile home owner . . . effectively a perpetual tenant of the park," according to the owners. *Id.* at 527. They argued for a *per se* taking under *Loretto*, because "what has been transferred from park owner to mobile home owner is no less than a right of physical occupation of the park owner's land." *Id.* The Supreme Court rejected the park owners' expansive theory of physical takings. *See id.* at 532 (majority), 539 (concurrence). "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at 527 (majority). The mobile home laws did "no such thing" because the park owners "voluntarily rented their land to mobile home owners." *Id.* Given that acquiescence, the laws "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant[,]" and did not constitute a physical taking. *Id.* at 528.

The Moratorium, too, temporarily regulates the landlord-tenant relationship by delaying owners' recourse to eviction. As in *Yee*, because the Landlords "voluntarily

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

open[ed] their property to occupation by others," they "cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." 503 U.S. at 531. The Moratorium thus regulates the rental relationship without a physical taking. *See Elmsford*, 469 F. Supp. 3d at164; *Heights Apts.*, 2020 WL 7828818, at *14.

The Landlords' attempts to distinguish *Yee* also fail. Just as in *Yee*, the Landlords voluntarily invited their tenants to occupy their properties; their tenants were "not forced upon them by the government." 503 U.S. at 528. And the Landlords' assertion that their tenants have continued to "occupy their property for a longer period than they ever agreed to," ECF No. 22 at 11, is no different than the claim in *Yee*, where the landlords similarly argued they could not evict their tenants. *Id.* at 526–27 ("Because under the California Mobilehome Residency Law the park owner cannot evict a mobile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park . . . ."). But the Moratorium allows the Landlords to "change the use" of their land, for instance, by selling or occupying the property themselves—with even less notice than the ordinance in *Yee. Compare id.* at 528 ("a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice[]"), *with* Procl. 20-19.6 (requiring 60-day notice for sale or re-occupation).

The Landlords' reliance on *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), for the proposition that "the physical occupation of their property does not depend upon the *duration* of the occupation," ECF No. 22 at 9–10,

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

is misplaced. *Arkansas Game* did not hold that a temporary occupation of property constitutes a categorical taking. It rather held, "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Arkansas Game*, 568 U.S. at 38. Far from constituting a *per se* taking, such a "temporary physical invasion[]" of property "should be assessed by case-specific factual inquiry" under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Arkansas Game*, 568 U.S. at 38. In conducting that inquiry, "time is indeed a factor in determining the existence *vel non* of a compensable taking." *Id.* Nor can the Landlords find support in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318 (1987), which was limited to the denial of "all use" of a property and has since been interpreted to eschew the categorical approach that the Landlords espouse here. *See Tahoe-Sierra*, 535 U.S. at 321 (holding that temporary takings are not *per se* violations but are instead analyzed under the multifactor *Penn Central* test).

The Landlords quote *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), for the proposition that an individual has the right to exclude freeriders. ECF No. 22 at 9. But in *Hendler*, the government sunk concrete wells on landowners' property to monitor groundwater pollution. *See* 952 F.2d at 1367. The wells, and the workers who entered to install and monitor them, permanently occupied plaintiffs' land, giving rise to a *per se* taking under *Loretto*. *Id.* at 1377. The decision rested squarely upon the permanent nature of the wells and the regular government intrusions to monitor them. *Id.* at 1376 ("There is nothing 'temporary' about the wells the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  Government installed on plaintiffs' property."). But here, there is no permanent

2  physical invasion on the Landlords' properties; no *per se* taking has occurred.

3  The Landlords' pre-*Yee* cases also miss the mark. The Landlords cite two

4  World War II-era cases in which the federal government itself occupied a building

5  for a period of time. ECF No. 22 at 8, 11 (citing *Kimball Laundry Co. v. United States*,

6  338 U.S. 1 (1949), *United States v. Petty Motor Co.*, 327 U.S. 372 (1946)). These

7  cases did not involve the mere regulation of a landlord's relationship with a third-

8  party tenant whom they had voluntarily invited to occupy the property.

9  The U.S. Supreme Court "has consistently affirmed that States have broad

10  power to regulate housing conditions in general and the landlord-tenant relationship

11  in particular without paying compensation for all economic injuries that such

12  regulation entails." *Yee*, 503 U.S. at 528–29 (cleaned up). In any event, the

13  Moratorium does not relieve tenants of their obligation to pay the rent owed. It merely

14  forecloses for a period of time a particular remedy—eviction—for nonpayment. That

15  temporary regulation of the landlord-tenant relationship is not a *per se* taking because

16  it does not authorize a permanent physical invasion of the Landlords' property.

17  **2.  Physical takings do not apply to interests in rental agreements**

18  The Landlords next contend that the Moratorium takes their property interests

19  in their contract rights. ECF No. 22 at 11. But their argument is an improper mish-

20  mash of physical and regulatory takings, and their reliance on *Cienega Gardens v.*

21  *United States*, 331 F.3d 1319 (Fed. Cir. 2003), is out of place. *Cienega Gardens*

22  involved a regulatory takings claim, not a physical one. *See* 331 F.3d at 1336–37.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   That case concerned property owners' vested property interests to pre-paying

2   federally subsidized mortgages after 20 years—thus freeing them from regulatory

3   restrictions governing mortgages—that were expressly abrogated by federal

4   legislation when that prepayment eligibility date approached. *Id.* at 1325. Here, the

5   Landlords are not party to contracts with the State that the Moratorium has altered.

6   And the Landlords do not claim that the Moratorium represents a "complete

7   elimination of value" of their properties, so they have no claim of a regulatory or

8   categorical taking. *Cienega Gardens* is of no avail. *See Tahoe-Sierra*, 535 U.S. at 330

9   (holding "[a]nything less than a 'complete elimination of value' or a 'total loss' . . .

10  would require the kind of analysis applied in *Penn Central*" and rejecting claim of a

11  *per se* regulatory taking).

12      **3.      The State is not confiscating security deposits**

13      The Landlords' argument that the Moratorium takes their interest in security

14  deposits is also meritless. First, the cases relied on the Landlords deal with actual

15  confiscation by the government. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449

16  U.S. 155 (1980) (evaluating whether interest exacted by county was a taking); *Brown

17  v. Legal Found. of Wash.*, 538 U.S. 216 (2003) (reviewing whether state supreme

18  court rule transferring interest on client funds to a legal aid foundation violated the

19  First and Fifth Amendments). But here, the State is not confiscating security deposits

20  or any interest at all. Instead, the Moratorium merely prohibits landlords from

21  withholding from tenants any portion of a security deposit in order to collect unpaid

22  rent. *See* Procl. 20-19.6. Second, the Landlords' theory is untenable because security

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  deposits are property of the tenant—not the landlord. *See* RCW 59.18.280 (requiring

2  security deposits be deposited in trust accounts "for the purpose of holding such

3  security deposits for tenants of the landlord" but entitling landlords to interest unless

4  otherwise agreed in writing).

5  *Armstrong v. United States*, 364 U.S. 40 (1960), does not help the Landlords

6  either. In that case, the Supreme Court held that certain state liens held by federal

7  subcontractors represented compensable property interests for purposes of the Fifth

8  Amendment, and that the United States' extinguishing of these lien interests

9  constituted a taking warranting just compensation. *See Armstrong*, 364 U.S. at 43,

10  48. Critically, the federal government took title to the underlying property at issue.

11  *Id.* at 43–44. Here, the State has not taken any property interest in security deposits.

12  The Moratorium does not extinguish remedies available to the Landlords seeking to

13  recover unpaid rent owed at the end of a lease nor diminish tenants' rental obligations.

14  Finally, RCW 59.18.260 does not support the Landlords' argument. That

15  statute merely requires that landlords provide in writing the terms and conditions for

16  when a deposit may be withheld if it is used as security for performance of a tenant's

17  obligations in a lease agreement. While the Moratorium may modify aspects of this

18  statutory scheme with respect to permissible uses of security deposits, the

19  Moratorium does not actually confiscate security deposits.

20  **4.     Equitable remedies are unavailable**

21  Even if the Landlords could show that a taking has occurred, which they

22  cannot, they are not entitled to equitable relief. The Takings Clause only prohibits the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

state from taking private property for public use "without just compensation," U.S.

Const. amend. V, so "[e]quitable relief is not available to enjoin an alleged taking of

private property for a public use, duly authorized by law, when a suit for

compensation can be brought against the sovereign subsequent to the taking."

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984).

The parties agree that injunctive relief is unavailable for their Takings Clause

claim. *See* ECF No. 22 at 16. Even if the Landlords had a viable takings claim, their

only remedy would be damages. *See El Papel*, 2020 WL 8024348, at *12–13; *Knick

v. Twp. of Scott, Penn.*, 139 S. Ct. 2162, 2175 (2019) ("the availability of subsequent

compensation mean[s] that such an equitable remedy [is] not available").

The Landlords are not entitled to declaratory relief either. They do not seek

money damages, ECF No. 27 ¶¶ 11–12, 32; *id.*, pp. 40–41, "so such a declaration

would be the functional equivalent of an unwarranted injunction against the

enforcement of the [Moratorium]." *Baptiste*, 490 F. Supp. 3d at 391; *see also County

of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 2769105, *4 (W.D. Pa. May 28,

2020) ("[T]he declaratory relief sought by Plaintiffs—that the Governor's business

shutdown orders effectuated an unconstitutional taking—would be the functional

equivalent of injunctive relief. The Supreme Court's decision in *Knick* forecloses

such relief."); *HAPCO*, 482 F. Supp. 3d at 358 & n.112 (same).

**D.** **The Moratorium Does Not Violate the Takings Clause of the Washington State Constitution**

The Governor and Attorney General are entitled to sovereign immunity on the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  Landlords' third claim that the Moratorium constitutes a physical taking in violation

2  of article I, § 16 of the Washington Constitution. *See supra* pp. 19–20. But should the

3  Court reach this issue, the claim fails as a matter of law. The Landlords are correct

4  that the takings standards under the state constitution "are the same as finding a taking

5  under the Fifth Amendment to the United States Constitution." ECF No. 22 at 20

6  (citing *Yim v. City of Seattle*, 194 Wn.2d 651, 672 (2019)). But the Moratorium does

7  not constitute a physical taking under those standards.

8      When the Washington Supreme Court in *Yim* adopted federal regulatory

9  takings standards, it expressly held that its "prior regulatory takings cases" can "no

10  longer be valid." 194 Wn.2d at 672; *see also id.* at 662 ("we disavow our precedent,

11  adopt the federal definition of regulatory takings"). Ignoring *Yim*'s fundamental

12  restatement of Washington takings jurisprudence, the Landlords cite several pre-*Yim*

13  cases. *See* ECF No. 22 at 20 (citing *Granat v. Keasler*, 99 Wn.2d 564, 570 (1983),

14  and *San Telmo Assocs. v. City of Seattle*, 108 Wn.2d 20, 25 (1987)). Again, the

15  Landlords are mistaken. Those cases were decided decades before *Yim* abrogated

16  their doctrinal underpinnings. *Granat* held that a city moorage-tenant protection law

17  effected a regulatory taking based on "reasonableness" and "balancing" tests.

18  99 Wn.2d at 568–69. Those tests plainly did not survive *Yim*. *See Yim*, 194 Wn.2d

19  at 672. Likewise, the Landlords' argument that the Moratorium effects a *per se* taking

20  by denying them the "right to exclude," ECF No. 22 at 21, is a vestige of pre-*Yim*

21  jurisprudence. *See Yim*, 194 Wn.2d at 671 (disavowing the "definition of per se

22  regulatory takings" that "broadly applies a categorical rule to any regulation that

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    destroys any fundamental attribute of ownership.").

2        The Landlords cite another 40-year-old case for the novel proposition that the

3    Moratorium violates the Takings Clause by infringing their property interests in

4    receiving rental income. ECF No. 22 at 21 (citing *Spokane School Dist. No. 81 v.*

5    *Parzybok*, 96 Wn.2d 95, 97–98 (1981)). *Parzybok* held that principles of "equity and

6    fairness" allow compensation for a resident leaseholder who, during eminent domain

7    proceedings, lost an option to buy premises at a specific price. 96 Wn.2d at 103. The

8    decision does not remotely stand for the proposition that rental income constitutes a

9    property right protected by the Takings Clause. And the U.S. Supreme Court "has

10   consistently affirmed that States have broad power to regulate housing conditions in

11   general and the landlord-tenant relationship in particular without paying

12   compensation for all economic injuries that such regulation entails." *Yee*, 503 U.S.

13   at 528–29 (cleaned up). In any event, the Moratorium does not deprive the Landlords

14   of any rent nor relieve tenants of their obligation to pay the full amount of rent owed.

15   It merely forecloses for a period of time a particular remedy—eviction—for

16   nonpayment. The temporary regulation of the landlord-tenant relationship is not a *per*

17   *se* taking; it does not allow a permanent physical invasion of the Landlords' property.

18       Finally, the Landlords argue that the Moratorium does not take their property

19   "for public use at all, but for the private use of tenants." ECF No. 22 at 21. This

20   overlooks the Moratorium's manifest public purpose to prevent the spread of

21   COVID-19. This argument is also irrelevant because the public-private "distinction

22   is relevant only to the appropriate remedy where a taking has been shown[.]" *Yim*,

1   194 Wn.2d at 673. The Landlords have not shown any taking, and even if they had,

2   they seek only declaratory and injunctive relief, not damages.

3   **E.      The Moratorium Comports with the Contracts Clause**

4          The State is entitled to summary judgment on the Landlords' first claim for

5   relief under the Contracts Clause. The court in *El Papel*, evaluating the same

6   Moratorium challenged here, has already held that it "do[es] not violate the Contracts

7   Clause." 2020 WL 8024348, at *9. Several federal courts are in accord—rejecting

8   Contracts Clause challenges to state or local eviction moratoria.[7]

9          Article I, section 10 of the U.S. Constitution prohibits states from passing laws

10  "impairing the Obligation of Contracts." U.S. Const. art. I, § 10. The Contracts Clause

11  is construed "narrowly" so that "governments retain the flexibility to exercise their

12  police powers effectively." *Matsuda v. City and County of Honolulu*, 512 F.3d 1148,

13  1152 (9th Cir. 2008) (cleaned up). Courts apply a two-step inquiry under the

14  Contracts Clause. First, courts determine "whether the state law has operated as a

15  substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815,

16  1821–22 (2018) (cleaned up). Second, if a substantial impairment exists, courts

17  evaluate "whether the state law is drawn in an 'appropriate' and 'reasonable' way to

18  advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs.*

19  

20          [7] *Heights Apts.*, 2020 WL 7828818, at *12; *Apt. Ass'n of L.A. Cnty.*, 2020

21  WL 6700568, at *8; *Baptiste*, 490 F. Supp. 3d at 353; *HAPCO*, 482 F. Supp. 3d

22  at 355–56; *Auracle Homes*, 478 F. Supp. 3d at 199; *Elmsford*, 469 F. Supp. 3d at 172.

*Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). The Moratorium—a temporary, carefully-crafted emergency measure—meets both steps.

**1.     The Moratorium does not impose a substantial, unforeseeable impairment on rental agreements**

Three factors govern the analysis of whether a law imposes a "substantial impairment" on a contractual relationship: "the extent to which" the law (1) "undermines the contractual bargain," (2) "interferes with a party's reasonable expectations," and (3) "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Each factor indicates that the Moratorium does not impair the Landlords' contractual relationships with their tenants.

**a.     The Moratorium does not undermine the contractual bargain**

The Moratorium does not undermine the Landlords' contractual bargain with their tenants because the mere delay in the right to exercise a statutory remedy does not materially alter the lease agreements. In *Home Building and Loan Association v. Blaisdell*, 290 U.S. 398 (1934)—the "leading case in the modern era of Contract Clause interpretation[,]" *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 15 (1977)—the Supreme Court upheld a Depression-era mortgage moratorium law extending mortgagors' redemption period *for up to two years*. The Court recognized that contractual obligations may be "impaired by a law which renders them invalid, or releases or extinguishes them[,]" such as a "state insolvent law" that wholly "discharge[s] the debtor from liability" for preexisting debts. *Blaisdell*, 290 U.S. at 431. The mortgage moratorium, however, did not impose such an impairment, for

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    it represented a "temporary restraint of enforcement . . . to protect the vital interests

2    of the community[]" from a "great public calamity." *Id.* at 439.

3        The same is true of the Moratorium here. As a federal district court explained

4    in upholding New York's eviction moratorium, it "does not eliminate the suite of

5    contractual remedies available to the Plaintiffs; it merely postpones the date on which

6    landlords may commence summary proceedings against their tenants." *Elmsford*, 469

7    F. Supp. 3d at 172; *see also HAPCO*, 482 F. Supp. 3d at 352 (Philadelphia

8    moratorium is "only a minimal alteration of contractual obligations" because as in

9    *Blaisdell*, "it merely postpone[s] the date on which landlords may commence eviction

10   proceedings and collect full rent") (internal quotation marks and citation omitted);

11   *Auracle Homes*, 478 F. Supp. 3d at 224 (Connecticut moratorium does "not eliminate

12   Plaintiffs' contractual remedies for evicting nonpaying tenants; Plaintiffs instead

13   have to wait before they may issue notices to quit or initiate summary proceedings.").

14       The Landlords' assertion that the Moratorium's "prohibition on treating unpaid

15   rent as a debt" "remov[es] all practical remedies for contractual violations[,]" ECF

16   No. 22 at 23, overlooks the fact that "tenants are still bound to their contracts," and

17   the Landlords may still "obtain a judgment for unpaid rent if the tenants fail to honor

18   their obligations[,]" *Elmsford*, 469 F. Supp. 3d at 172. The Moratorium expressly

19   permits property owners to treat unpaid rent as an enforceable debt if they

20   "demonstrate . . . to a court that the resident was offered, and refused or failed to

21   comply with" a reasonable repayment plan. Procl. 20-19.6. In this way and others,

22   the Moratorium preserves the primary benefit of the Landlords' bargain.

DEFENDANTS' OPPOSITION TO                33
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The Landlords contend that the Moratorium substantially impairs their contracts because "the right to enforce them has been completely taken away." ECF No. 22 at 23. They cite *Bronson v. Kinzie*, 42 U.S. 311 (1843), for the proposition that a contractual impairment may be substantial even where a remedy for contractual breaches is merely delayed. *Id.* at 24. But in distinguishing *Bronson*, and upholding a mortgage foreclosure law, the Court in *Blaisdell* made the point that the statute challenged in *Blaisdell* did not substantively impair the debt. 290 U.S. at 425. The *Blaisdell* Court went on to reject the argument the Landlords raise:

> [I]t does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. *** And, if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes.

*Blaisdell*, 290 U.S. at 439-40. *Blaisdell* also distinguished the cases relied on by the Landlords, like *Bronson*, explaining that those cases did not consider states' interests in exercising its police powers to "safeguard the vital interests of its people." *Id.* at 434. *Blaisdell* makes clear that socioeconomic changes—like the "constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests"—correspondingly change the boundaries of the state's police power. *Id.* at 442.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The Landlords next contend that *Blaisdell* and other cases instruct that the moratoria can only be upheld if tenants continue to pay fair rent. *See* ECF No. 22 at 25–26. But the *Blaisdell* Court did not hold that the contemporaneous rent aspect of the Minnesota order was essential to its reasonableness. The opinion includes a list of other factors that rendered the order reasonable, including that, like here, many essential contractual obligations remained intact, e.g., "the integrity of the mortgage indebtedness [was] not impaired" and "the validity of the sale and the right of mortgagee-purchaser to title obtain a deficiency . . . [were] maintained." *Blaisdell*, 290 U.S. at 445–46. And as the *El Papel* court explained, "the law in *Blaisdell* did not, in fact, guarantee a monthly rent payment. Instead, it was up to a court to set the time and manner of repayment." 2020 WL 8024348, at *7. Instead, "*Blaisdell* and subsequent cases make clear that there is no precise formula or factor-based test to be applied in every case but that the overarching consideration must be the reasonableness of the impairment based on the facts of the case." *Id.* Here, though the Moratorium does not condition its protection on the continued payment of rent, the State has allocated hundreds of millions of dollars to landlords and tenants to cover unpaid rent during the course of the pandemic—rental assistance funds of which the Landlords themselves have taken advantage of. The Landlords totally ignore this aspect of the State's pandemic response, which significantly mitigates the financial burden of the Moratorium. *See El Papel*, 2020 WL 8024348, at *9 (discussing State's efforts "to soften the blow on lessors" through rental assistance);

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*supra* pp. 9–12 (discussing rental assistance measures).

The Landlords further misconstrue the Moratorium when arguing that the Moratorium prevents landlords "from treating unpaid rent as an enforceable debt and bringing a breach-of-contract action." ECF No. 22 at 28. This is wrong. The Moratorium prohibits treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020." Procl. 20-19.6. The Moratorium also permits a landlord to collect *any* unpaid rent if a tenant refuses or fails to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident." *Id.* The Moratorium thus permits action other than eviction to collect unpaid rent under certain conditions.

### b.   The Moratorium does not impair reasonable expectations

The reasonableness of a party's contractual expectations largely depends on "whether the industry the complaining party has entered has been regulated in the past." *Energy Rsrvs. Grp.*, 459 U.S. at 411. "Because past regulation puts industry participants on notice that they may face further government intervention in the future," later regulations are "less likely to violate the contracts clause where [they] cover[] the same topic as the prior regulation and share[] the same overt legislative intent to the protect the parties protected by the prior regulation." *Elmsford*, 469 F. Supp. 3d at 169–70 (cleaned up).

This factor, too, undercuts the Landlords' Contracts Clause claim. "[T]he

landlord-tenant relationship is, if nothing else, heavily regulated." *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987). The Residential Landlord Tenant Act (RLTA), RCW 59.18, regulates many aspects of the landlord-tenant relationship by, for example, establishing a duty to keep the premises fit for human habitation, RCW 59.18.060; requiring notice of rent increases, RCW 59.18.140; and regulating late fees, RCW 59.18.170, notices of termination, RCW 59.18.200, tenant screening, RCW 59.18.257, and security deposits, RCW 59.18.260–.280. The Forcible Entry and Forcible and Unlawful Detainer Act and RLTA specifically regulate evictions, too. *See* RCW 59.12; RCW 59.18.365–.410. Thus, an "eviction moratorium" cannot "operate as a substantial impairment of [the Landlords'] contractual rights," because it is not "wholly unexpected government" action. *Auracle Homes*, 478 F. Supp. 3d at 224 (cleaned up).

Several courts, examining Contracts Clause challenges to eviction moratoria in other locales, have relied upon this history of regulation to conclude that eviction moratoria are relatively minor alterations to existing regulatory frameworks, and therefore do not interfere with landlords' reasonable expectations. *See, e.g.*, *HAPCO*, 482 F. Supp. 3d at 352 ("Against this heavily-regulated backdrop, it is doubtful that any impairment . . . has occurred as a result of the [eviction moratorium].") (cleaned up); *Elmsford*, 469 F. Supp. 3d at 169–70.

Moreover, the Landlords' lease agreements do not expressly provide for nonpayment of rent as a ground for eviction. As the Supreme Court has held, "a reasonable modification of statutes governing contract remedies is much less likely

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MSJ NO. 1:20-cv-03182-SAB

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1 to upset expectations than a law adjusting the express terms of an agreement."

2 *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.17 (1977). And any implied

3 contract rights that are conferred by state laws, "including judicial remedies such as

4 eviction, may be the subject of a Contracts Clause claim 'only when those laws affect

5 the validity, construction, and enforcement of contracts.'" *Elmsford*, 469 F. Supp. 3d

6 at 172 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)).

7             **c.      The Landlords may safeguard or reinstate their rights**

8             Finally, the Moratorium allows the Landlords to protect their contractual rights

9 and thus does not impair them. In *Sveen*, the Court held that a law altering contractual

10 remedies without nullifying them does not "prevent[] the party from safeguarding or

11 reinstating [their] rights." 138 S. Ct. at 1822. The Moratorium neither relieves

12 tenants' obligation to pay all rent owed nor eliminates the Landlords' right to enforce

13 that obligation. Rather, it merely requires them "to wait before they may issue notices

14 to quit or initiate summary proceedings." *Auracle Homes*, 478 F. Supp. 3d at 224.

15 Because "the tenants are still bound to their contracts, the contractual bargain is not

16 undermined and landlord rights are safeguarded." *HAPCO*, 482 F. Supp. 3d at 353.

17 The Moratorium further mitigates the temporary burden by allowing property owners

18 to evict if they intend to sell or personally occupy the home. Or they may offer a

19 reasonable repayment plan and, if refused or violated, take steps to recover unpaid

20 rent and any damages resulting from a tenant holding over. RCW 59.18.410. The

21 Moratorium preserves landlord protections and imposes no substantial impairment.

22

### 2. The Moratorium advances a significant public purpose in an appropriate and reasonable way

Even assuming the Moratorium substantially impaired any contract, the Landlords' claim fails the second step of the Contracts Clause inquiry. A temporary emergency measure to prevent economic dislocation and slow the spread of disease, the Moratorium furthers "a significant and legitimate public purpose" in "an appropriate and reasonable way." *Sveen*, 138 S. Ct. at 1822 (cleaned up).

#### a. The Moratorium's purpose is significant and legitimate

The Moratorium's purposes—to "reduce economic hardship" of those "unable to pay rent as a result of the COVID-19 pandemic" and "promote public health and safety by reducing the progression of COVID-19 in Washington State," Procl. 20-19.6—are not just significant and legitimate, but compelling. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("Stemming the spread of COVID–19 is unquestionably a compelling interest . . . ."); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."). The *El Papel* court has already held that the purposes of the Moratorium are "undisputedly legitimate purposes." 2020 WL 8024348, at *10.

The Moratorium is one tool, of several, addressing the gravest public health crisis in over a century and the associated economic fallout that has triggered soaring unemployment. *See* Baumgart Decl. ¶¶ 7, 21. The Moratorium seeks to avert a mass increase in evictions that would trigger a housing instability and homelessness crisis,

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

which would exacerbate the spread of COVID-19. Experts agree that policies that limit evictions reduce COVID-19 infections and deaths, and that an individual risk of infection is substantially higher for individuals who experience eviction or whose household structures merged because of housing instability. *See* Lindquist Decl. ¶¶ 61–63. Within our State, mass evictions could cause up to 59,008 more eviction-attributable COVID-19 cases, 5,623 more hospitalizations, and 621 more deaths. Murray Decl., Ex. B. And the Moratorium's provision limiting the treatment of unpaid rent as an enforceable debt helps prevent "soft" or "informal" evictions—that is, measures short of unlawful detainer actions that lead tenants to "self-evict" to avoid negative credit history, an adverse judgment, or other collateral consequences. Baumgart Decl. ¶ 17; *see also* 86 Fed. Reg. 21163, 21166–67 (Apr. 22, 2021) (noting that "informal evictions may be common" and "have increased during the COVID-19 pandemic").

The Landlords' attempt to minimize the broad public benefits of the Moratorium falls flat. *See* ECF No. 22 at 25, 27. The manifest purpose of the Moratorium is to protect the entire State from the economic and public health consequences that would result from mass evictions. It does not relieve any obligations of tenants, who continue to owe any unpaid rent. *See Energy Rsrvs. Grp.*, 459 U.S. at 412 (explaining that the "requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests"). Virtually every law "regulating commercial and other human affairs . . . creates burdens for some that directly benefit others[,]" but that does not

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

make it unconstitutional "whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986). Designed to avert an economic and public health catastrophe, the Moratorium advances state interests that are just as important—if not more so—as those served by the mortgage moratorium upheld in *Blaisdell. See El Papel*, 2020 WL 8024348, at *9 (Moratorium was "designed to address the 'legitimate state interest' of protecting the public from the harms associated with this public emergency, rather than promoting the narrow interests of one group over another").

### b.     The Moratorium is reasonable and appropriate

The only remaining question, then, is whether the Moratorium is "reasonable" and "appropriate" in advancing the State's interests. The answer is yes. Where, as here, the State is not itself a "contracting party," the Court must "defer" to the Governor's "judgment as to the necessity and reasonableness of a particular measure[]" in answering that question. *Energy Rsrvs. Grp.*, 459 U.S. at 412–13 (cleaned up); *Elmsford*, 469 F. Supp. 3d at 169 ("[T]he law affords States a wide berth to infringe upon private contractual rights when they do so in the public interest . . . ."). This "latitude 'must be especially broad'" where "officials 'undertake to act in areas fraught with medical and scientific uncertainties,'" such as responding to the COVID-19 pandemic. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). So long as "those broad limits are not exceeded, they should not be subject to second-guessing by '. . . [the] judiciary,' which lacks

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  the background, competence, and expertise to assess public health." *Id.* (quoting

2  *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

3       The Moratorium fits paradigmatically within the Supreme Court's standard for

4  a reasonable and appropriate law. Like the mortgage moratorium upheld in *Blaisdell*,

5  the Moratorium is a response to an unprecedented "emergency which threaten[s] the

6  loss of homes." 290 U.S. at 444–45 (internal quotation marks omitted). The

7  Moratorium is "not for the mere advantage of particular individuals but for the

8  protection of a basic interest of society[,]" that is, to prevent mass evictions and the

9  spread of COVID-19. *Id.* at 445. Its terms are reasonable: it does not repudiate or

10 reduce tenants' rent obligations, so their "indebtedness is not impaired[.]" *Id.* And

11 the Moratorium is "temporary in operation[]" and "limited to the exigency which

12 called it forth." *Id.* at 447. In sum, "as in *Blaisdell*, where [the Court upheld]

13 temporary measures enacted in response to emergency conditions to allow people to

14 remain in their homes," the Moratorium advances important state goals in a

15 reasonable, appropriate way. *HAPCO*, 482 F. Supp. 3d at 355; *see El Papel*, 2020

16 WL 8024348, at *7 ("*Blaisdell* supports the reasonableness of [the Moratorium]").

17      For that reason, federal courts have uniformly rejected Contracts Clause

18 challenges to state and local eviction moratoria—including this Moratorium. The

19 *El Papel* court explained, "legislation impairing private contracts must have

20 reasonable conditions and a character appropriate to—that is, a reasonable relation

21 to—the [legitimate] public purpose justifying its adoption[.]" 2020 WL 8024348,

22 at *10. The Moratorium meets this standard because it is a reasonable and appropriate

1  means of "address[ing] vital public interests during a national public crisis." *Id.*
2  at *12. Like other moratoria upheld during this public health emergency, the
3  Moratorium "undoubtedly helps residents remain in their homes and, especially
4  considering the COVID-19 pandemic during which it is critical that
5  people . . . remain socially distant from each other[.]" *HAPCO*, 482 F. Supp. 3d
6  at 355. This Court should defer to the Governor's judgment that a temporary
7  moratorium on evictions is a "reasonable" and "appropriate" way to keep renters in
8  their homes and slow the spread of COVID-19, and therefore a permissible regulation
9  under the Contracts Clause. *See El Papel*, 2020 WL 8024348 at *10.

10       The Landlords maintain their argument that the Moratorium is unreasonable
11  because it applies "regardless of a tenant's employment [status] or ability to pay."
12  ECF No. 22 at 28. But "[s]eeking to avoid housing instability, whether of the rich or
13  of the poor, will keep people in their homes and reduce COVID-19 transmission."
14  *El Papel*, 2020 WL 8024348, at *10. The State considered but decided not to include
15  a hardship requirement because:

16       In many cases, tenants in genuine economic distress due to the pandemic
        are unable to provide adequate proof of their distress. Many tenants have
17       informal employment or non-traditional sources of income. For these
        tenants, proving distress is not as simple as submitting a copy of a
18       termination letter from an employer. And even if a tenant did not lose their
        job, they could be facing pandemic-related economic distress anyway,
19       such as the burden of caring for family members who lost their jobs or are
        unable to provide for themselves.

20  Baumgart Decl. ¶ 18. The *El Papel* court credited the State's explanation in holding
21  the Moratorium reasonable. *See* 2020 WL 8024348, at *11 (discussing the State's
22  efforts to balance interests of tenants and landlords); *see also Baptiste*, 490 F. Supp.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    3d at 386–87 (upholding Massachusetts' moratorium without a requirement for

2    tenants to certify inability to pay rent). The Court should defer to executive judgment

3    regarding the necessity and reasonableness of the Moratorium. *See El Papel*, 2020

4    WL 8024348, at *10 ("The law should be tailored to the emergency justifying its

5    enactment—although it need not be a perfect fit."); *Heights Apts.*, 2020 WL 7828818,

6    at *12 (the state's moratorium measures "need not be drawn with surgical precision

7    to avoid constitutional infirmity").

8    ### 3. This Court should follow *El Papel* and other the federal courts that have upheld eviction moratoria

9

10   Against the great weight of authority, the Landlords make strained arguments

11   to avoid the *El Papel* decision and to distinguish the Moratorium from the

     moratorium upheld in *Heights Apartments*, 2020 WL 7828818. ECF No. 22 at 26, 30.

12   But these arguments misapprehend the Moratorium and the decision in *El Papel*.

13   To evade *El Papel*, the Landlords argue that the court only "look[ed] at the

14   moratorium on evictions[]" instead of considering it "coupled with the prohibition

15   on treating unpaid rent as an enforceable debt." ECF No. 22 at 30. But this is clearly

16   wrong. The *El Papel* court explicitly discussed that "plaintiffs take issue with the

17   state's repayment plan provision, disallowing treating rent that is unpaid because of

18   COVID-19 as an enforceable debt . . . unless the tenant has rejected a reasonable

19   repayment plan" and concluded the provision "is an appropriate and reasonable

20   measure, particularly where it is tied directly to nonpayment that is caused by the

21   COVID-19 outbreak." 2020 WL 8024348, at *11.

22

1    In *Heights Apartments*, the court rejected a challenge to a similar moratorium

2    in Minnesota, which limited evictions to where the resident endangered the safety of

3    others; significantly damaged property, violating a lease term; or the property owner

4    or family sought to move in. *See* 2020 WL 7828818, at *2. Under that moratorium,

5    and this one, tenants remain responsible for paying their rent, and the moratoria are

6    "best characterized as a constitutionally-permissible delay in the Landlords' ability

7    to evict[.]" *Id.* at *13. The Landlords further fail to distinguish the many federal cases

8    that have upheld other state and local moratoria against Contracts Clause challenges.

9    *See supra* p. 31 n.7 (citing cases).

10   **F.      The Moratorium Does Not Violate Substantive Due Process**

11        The Court should grant summary judgment in favor of the State on the

12   Landlords' fourth claim under the Due Process Clause. The Moratorium is rationally

13   related to the ends of keeping tenants in homes and curbing the transmission of

14   COVID-19, the void for vagueness doctrine does not apply, and the Landlords do not

15   have a standalone due process claim.

16        **1.      The Moratorium is a rational and legitimate**

17        The Fourteenth Amendment states that "[n]o State shall . . . deprive any person

18   of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

19   The standard for substantive due process review is low: "Legislative acts that do not

20   impinge on fundamental rights or employ suspect classifications are presumed valid,

21   and this presumption is overcome only by a 'clear showing of arbitrariness and

22   irrationality.'" *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234

1 (9th Cir. 1994) (quoting *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981)). Courts look

2 to whether legislation "advances any legitimate public purpose" and "if it is at least

3 fairly debatable that the decision . . . was rationally related to legitimate

4 governmental interests." *Id.* (cleaned up). The Landlords bear the "extremely high"

5 burden of showing that the Moratorium is arbitrary and irrational. *Richardson v. City*

6 *& County of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997).

7     The Landlords ask the Court to spurn this "rational basis" analysis and instead

8 look at whether the Moratorium is "unduly oppressive." ECF No. 22 at 34. But the

9 Supreme Court has "long eschewed" that standard "when addressing substantive due

10 process challenges by government regulation." *Lingle v. Chevron U.S.A. Inc.*, 544

11 U.S. 528, 542 (2005); *see Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("We have

12 returned to the original constitutional proposition that courts do not substitute their

13 social and economic beliefs for the judgment of legislative bodies, who are elected to

14 pass laws."). Courts must look to whether a regulation is arbitrary and irrational. *Id.*

15 at 542; *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (explaining that the

16 Due Process Clause is intended to protect the individual against "the exercise of

17 power without any reasonable justification in the service of a legitimate governmental

18 objective"). And the Court has made clear that cases relied on by the Landlords, like

19 *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962), should be read as applying a

20 deferential standard that corresponds to rational basis review. *Lingle*, 544 U.S. at 541.

21     The Landlords' due process claim fails for several reasons. First, such claims

22 are assessed using a "less searching" standard than Contracts Clause claims.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984). So, for the same reasons the Moratorium furthers a significant and legitimate public purpose in an appropriate and reasonable way, *supra* pp. 39–44, the Moratorium is not arbitrary or irrational. *See HAPCO*, 482 F. Supp. 3d at 356. The *Blaisdell* Court, having concluded that there was no Contracts Clause violation, summarily disposed of a corresponding due process claim. 290 U.S. at 447–48 ("We are of the opinion that the Minnesota statute . . . does not violate the contract clause . . . . Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned. What has been said on that point is also applicable to the contention presented under the due process clause."). This Court should do so here too.

Second, the Landlords cannot make a "clear showing" that the Moratorium is arbitrary and irrational. *Hodel*, 452 U.S. at 332. Placing temporary limits on evictions and security deposits no doubt are *rationally* related to the legitimate end of keeping tenants in their homes and reducing the progression of COVID-19 in the State. *Baptiste*, 490 F. Supp. 3d at 394 (state moratorium rationally related to interests in keeping tenants in place); *HAPCO*, 482 F. Supp. 3d at 357 ("it is not irrational for the City to assume that the fear of accumulating interest and late fees would cause many tenants who are experiencing a COVID-19 financial hardship to self-evict").

Third, the Landlords' asserted "fundamental" right at stake—their "rights to determine the conditions upon which a person may continue to occupy the owner's property"—is an economic interest, not a fundamental right or liberty interest that warrants heightened protection. *See* ECF No. 22 at 35; *Washington v. Glucksberg*,

1  521 U.S. 702, 720 (1997) ("heightened protection" applies only to "fundamental

2  rights and liberty interests," *e.g.*, "rights to marry," "to have children"); *Stop the*

3  *Beach*, 560 U.S. at 721 ("The liberties protected by substantive due process do not

4  include economic liberties."); *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)

5  (explaining there is no "fundamental right to evict" a tenant).

6  **2.     The void for vagueness doctrine is not applicable**

7  "A fundamental principle in our legal system is that laws which regulate

8  persons or entities must give fair notice of conduct that is forbidden or required."

9  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "This requirement

10  of clarity[,] . . . essential to the protections provided by the Due Process Clause,"

11  *Fox Television*, 567 U.S. at 253, "is implicated" when the government imposes "civil

12  *penalties*," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996).

13  The Landlords contend that the Moratorium's prohibition on landlords treating

14  unpaid rent as an enforceable debt is too vague. But the vagueness principle does not

15  apply, because this provision does not impose criminal punishment or civil penalties

16  on the Landlords. Rather, tenants may use as "defense to any lawsuit or other attempts

17  to collect" the fact that landlords did not "provide a reasonable repayment plan."

18  Procl. 20-19.6. The cases relied on by the Landlords—*Fox Television*, 567 U.S. 239,

19  and *Grayned v. City of Rockford*, 408 U.S. 104 (1972)—do not apply here because

20  they dealt with challenges to a sanction and a conviction.

21  The Landlords argue that it is "impossible" for them to know how to meet this

22  reasonable repayment criteria because they do not have the necessary information

regarding their tenants' health, financial, or other circumstances. ECF No. 22 at 32–33. Yet the Landlords do not submit evidence to show the circumstances of whether and how the Landlords attempted to learn this information in order to offer a reasonable repayment plan. *See* ECF No. 24 ¶ 5; ECF No. 25 ¶ 6; ECF No. 26 ¶ 7; Sepe Decl., Ex. P. And, at the very least, the Landlords would have some knowledge of a tenant's financial circumstances, given that virtually all landlords require prospective tenants to disclose (and verify) their income.[8]

But even if the void for vagueness doctrine applied, the Moratorium is not impermissibly vague. It provides "flexibility and reasonable breadth" to courts. *Grayned*, 408 U.S. at 110. In evaluating whether a repayment plan was reasonable, courts are asked to evaluate the tenant's "financial, health, and other circumstances of that resident." Procl. 20-19.6. These considerations provide "fair notice" to the Landlords of what is expected. *Fox Television*, 567 U.S. at 253.

### 3. The Landlords cannot repackage their other claims into a Due Process Clause claim

Claims of constitutional violations cannot be aggregated and repackaged into a separate substantive due process claim that does the work of the other parts of the Constitution. *See Stop the Beach*, 560 U.S. at 721 ("Where a particular Amendment

---

[8] *See* Tenants Union of Wash. State, *Tenant Screening*, https://tenantsunion.org/rights/tenant-screening. And resources are available for landlords and tenants to draft reasonable repayment plans for unpaid rent or other charges related to housing. *See, e.g.*, Sepe Decl., Ex. R.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

49

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." ) (cleaned up). Yet the Landlords' Due Process Clause claim merely recycles their Takings Clause and Contracts Clause claims. *See* ECF No. 22 at 35 (grounding the Landlords' due process rights in "several related constitutional provisions").

The Landlords here have not identified a property interest independent of the interests asserted in their other constitutional claims under the Contracts Clause and the Takings Clause. This is fatal to their Due Process Clause claim. "Since the Landlords' claims can be analyzed under these constitutional provisions, the Landlords may not bring a separate substantive due process claim." *Heights Apts.*, 2020 WL 7828818, at *17; *see also Auracle Homes*, 478 F. Supp. 3d at 226–27; *Elmsford*, 469 F. Supp. 3d at 173.

## G.    Declaratory Relief Under § 1983 Should Be Denied

Finally, because the Landlords' claims under the Contracts, Takings, and Due Process Clauses fail as a matter of law, they are not entitled to relief under section 1983. *See Heights Apts.*, 2020 WL 7828818, at *17 (dismissing § 1983 claim based on same constitutional violations separately alleged because the violation of a constitutional right is an essential element of a § 1983 claim).

## IV.    CONCLUSION

The Court should enter summary judgment in favor of the State and dismiss the Landlords' claims with prejudice.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

50

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

DATED this 21st day of May, 2021.

ROBERT W. FERGUSON
Attorney General

*s/ Cristina Sepe*
CRISTINA SEPE, WSBA #53609
ZACHARY PEKELIS JONES, WSBA #44557
BRIAN H. ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
800 5th Avenue, Ste. 2000
Seattle, WA 98104
(206) 474-7744
cristina.sepe@atg.wa.gov
zach.jones@atg.wa.gov
brian.rowe@atg.wa.gov
jeffrey.even@atg.wa.gov
*Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 1:20-cv-03182-SAB

51

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

**DECLARATION OF SERVICE**

2   I hereby declare that on this day I caused the foregoing document to be

3   electronically filed with the Clerk of the Court using the Court's CM/ECF System

4   which will serve a copy of this document upon all counsel of record.

5   DATED this 21st day of May, 2021, at Tacoma, Washington.

6

7   *s/ Cristina Sepe*
    Cristina Sepe, WSBA #53609
    Assistant Attorney General
8   800 5th Avenue, Ste. 2000
    Seattle, WA  98104
9   (206) 474-7744
    cristina.sepe@atg.wa.gov

10

11

12

13

14

15

16

17

18

19

20

21

22