FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 21, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ENRIQUE JEVONS, as managing member of Jevons Properties LLC; JEVONS PROPERTIES LLC; FREYA K. BURGSTALLER, as trustee of the Freya K. Burgstaller Revocable Trust; JAY GLENN; and KENDRA GLENN, <br><br> Plaintiffs, <br><br> v. <br><br> JAY INSLEE, in his official capacity as the Governor of the State of Washington; and ROBERT FERGUSON, in his official capacity of the Attorney General of the State of Washington, <br><br> Defendants. | No. 1:20-CV-3182-SAB <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court are the parties' cross-Motions for Summary Judgment. ECF Nos. 22, 30. The Court heard oral argument on the motions on August 24, 2021 by videoconference. Richard Stephens appeared by video on behalf of Plaintiffs Enrique Jevons; Jevons Properties, LLC; Freya K. Burgstaller; Jay Glenn; and Kendra Glenn. Cristina Sepe and Brian Rowe appeared by video on

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 1**

behalf of Defendants Washington State Governor Jay Inslee and Washington State Attorney General Robert Ferguson.

This action concerns several constitutional challenges to Washington's eviction moratorium enacted in response to the COVID-19 pandemic. To mitigate the spread of COVID-19 and prevent exacerbation of homelessness in the state, Washington State Governor Jay Inslee issued Proclamation 20-19 on March 18, 2020. The Proclamation and subsequent revisions established a moratorium on evictions, among other protective health and safety measures. That eviction moratorium persists—although under new conditions for when landlords and property managers may pursue evictions and enforcement of rental debt—through the Governor's "Bridge Proclamation."

After reviewing the parties' briefing, oral argument, and the applicable caselaw, the Court denied Plaintiffs' Motion for Summary Judgment and granted Defendants' Cross-Motion for Summary Judgment at the hearing. Upon reaching the merits of Plaintiffs' arguments, the Court held that Washington's eviction moratorium does not violate the Takings Clause, Contracts Clause, or Due Process Clause of the United States Constitution. This Order memorializes the Court's ruling.

## I.    Facts[1]

### A. <u>The COVID-19 Outbreak and Washington's Eviction Moratorium</u>

On February 29, 2020, Washington State Governor Jay Inslee issued Proclamation 20-05, declaring a state of emergency in Washington from the outbreak of novel coronavirus SARS-CoV-2. The SARS-CoV-2 virus causes coronavirus disease 2019 ("COVID-19"), a highly contagious and potentially fatal respiratory tract infection. The virus spreads primarily through close interactions

---

[1] The following facts are taken from the parties' respective statements of material facts and responses thereto. *See* ECF Nos. 23, 31, 38, 41.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 2**

via respiratory droplets, and there is a lag of several days before the onset of symptoms. Seniors and persons with preexisting medical conditions are most vulnerable to complications and death from COVID-19, and statistics indicate that people of color disproportionately contract and experience severe COVID-19 health outcomes. Without a vaccine or highly effective treatment for COVID-19 at the time of the outbreak, reducing person-to-person contact through community mitigation measures was the most effective way of combatting transmission and ensuring Washington's healthcare system was not overwhelmed. Accordingly, Governor Inslee ordered Washingtonians to stay home except for participation in essential activities and businesses.

The Governor's Office also recognized that the COVID-19 pandemic would significantly reduce economic output and income, making many tenants unable to afford rent from the outset of the pandemic. Prior to the outbreak, the state was facing a homelessness and housing instability crisis. Between 2013 and 2017, over 130,000 adults in Washington faced an eviction, and by 2018, homelessness in the state reached Great Recession levels. Without countermeasures, the Governor's Office anticipated that the COVID-19 pandemic's economic dislocations would result in mass evictions, exacerbating housing instability and homelessness in the state. A rise in evictions, and the lifting of the eviction moratoria generally, are associated with an increase in COVID-19 infections and deaths. Projections performed by the University of Washington Institute for Health Metrics and Evaluation indicated that mass evictions could have resulted in between 18,235 to 59,008 more eviction-attributable COVID-19 cases, 1,172 to 5,623 more hospitalizations, and 191 to 621 more deaths in the state. Even under lockdown scenarios, containment of COVID-19 was slower and less effective at reducing the size of the pandemic when evictions were allowed to continue.

The Washington State Department of Health ("DOH") was particularly concerned with outbreaks of COVID-19 among persons experiencing housing

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 3**

insecurity and homelessness. As of April 25, 2021, the DOH identified 202 COVID-19 outbreaks in homeless services or shelters. People experiencing homelessness are typically at increased risk of acquiring COVID-19 due to crowded living situations. Housing insecure families may find themselves in shared living conditions, which have been found to increase contact with people and make compliance with public health guidance difficult. People experiencing homelessness are also at an increased risk for severe COVID-19, due to a higher rate of underlying medical conditions and co-morbidities.

For the foregoing reasons, Governor Inslee signed Proclamation 20-19 on March 18, 2020, establishing a temporary moratorium on evictions in Washington. The Governor issued subsequent proclamations on April 16, 2020 (Proclamation 20-19.1), June 2, 2020 (Proclamation 20-19.2), July 24, 2020 (Proclamation 20-19.3), October 14, 2020 (Proclamation 20.19-4), December 31, 2020 (Proclamation 20-19.5), and March 18, 2021 (Proclamation 20-19.6), refining the moratorium and other health and safety measures with each revision. While broadly prohibiting the commencement of eviction proceedings, the proclamations did not forgive any debt of unpaid rent and stressed that tenants "who are not materially affected by COVID-19 should and must continue to pay rent." Proc. 20-19.6, ¶ 7. The Governor's public messaging has also expressly stated that tenants should pay rent if able and should communicate with landlords. Beginning with Proclamation 20-19.1, the moratoria also prohibited attempts to collect any such unpaid rent through withholding of the tenant's security deposit. *E.g.*, Proc. 20-19.1, ¶ 26. Plaintiffs in this action primarily challenged the last rendition of the moratorium, Proclamation 20-19.6. Proclamation 20-19.6 ended by its own terms on June 30, 2021, and by operation of subsequent legislation, which is discussed in the following section. *Id.* at ¶ 26. The eviction moratorium and attendant provisions are still in effect through a Bridge Proclamation, however, which is effective until September 30, 2021.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 4**

Following input from property owners, beginning with Proclamation 29-19.1, the Governor's Office permitted landlords to treat unpaid rent as an enforceable debt during the state of emergency, provided that the tenant was offered, but refused, a reasonable payment plan based on the financial, health, or other circumstances of the tenant. The exception expressly placed the burden of proof to enforce rental debt on landlords and property managers. This decision was made because, in many cases, tenants in genuine economic distress due to the pandemic were unable to provide adequate proof of their distress. The Governor's Office reasoned that many tenants have informal employment or non-traditional sources of income and that, for these tenants, proving distress is not as simple as submitting a copy of a termination letter from an employer. A tenant who does not lose their job could be facing pandemic-related economic or health distress anyway, such as the burden of caring for family members who lost their jobs or being unable to provide for themselves. The revised moratorium thus placed the burden of proof on landlords and property managers based on the state's belief that not all tenants in need of protection were able to submit a declaration of hardship.

Overall, during the COVID-19 public health crisis, over 1.6 million Washingtonians have filed unemployment claims, and the state's unemployment rate has exceeded its Great Recession peak. Through the first four months of 2021, over 265,000 new unemployment claims were filed, demonstrating that the job crisis persisted over a year after COVID-19 emerged. Recent census survey data reported that 10.7% of renters in Washington (160,342 people) were behind on their rent, and 17.8% of renters (265,342 people) in Washington reported having little or no confidence in their ability to pay rent. An analysis by the Aspen Institute found that 649,000 to 789,000 people in Washington—up to 10.3% of the state's entire population—would be at risk of eviction without the state's eviction moratorium. During the pandemic, at least 18,000 more Washingtonians have relied on cash assistance and 160,000 more on food assistance. The Court also

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 5**

notes that the Eastern District of Washington, which encompasses most of the state's landmass, faces unique and ongoing challenges from the COVID-19 pandemic. Vaccinations in eastern Washington have lagged behind the rest of the state for numerous reasons, including misinformation and lack of accessibility.[2]

### B. Senate Bill 5160 and the Housing Stability "Bridge" Proclamation

In April 2021, Senate Bill 5160 ("SB 5160") was adopted by the Washington Legislature and signed into law by Governor Inslee. Engrossed Second Substitute S.B. 5160, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 115. The legislation provides tenants certain protections during and after the public health emergency. Sections 7 and 8 of SB 5160 established an eviction resolution pilot program for nonpayment of rent and a right to legal representation in eviction cases, respectively. Section 7 also authorized landlord access to certain rental assistance programs. While SB 5160 became effective on April 22, 2021, localities are still working to implement the rental assistance and eviction resolution pilot programs in their jurisdictions. In Yakima County, where Plaintiffs are located, both programs are fully operational.

Due to the delay in implementation, Governor Inslee issued a housing stability "bridge" proclamation on June 29, 2021, which was intended to "bridge the operational gap between the eviction moratorium enacted by prior

---

[2] Annette Cary, *Tri-Citians Slower Than Others to Get the COVID Vaccine. What's the Holdup?*, TRI-CITY HERALD (Apr. 14, 2021 07:43 P.M.), https://www.tri-cityherald.com/news/coronavirus/article250299784.html (last accessed Sept. 20, 2021); Danny Westneat, *The Political Vaccine Divide in Washington State Is Widening—And COVID Rushes In*, THE SEATTLE TIMES (May 2, 2021, 1:17 P.M.), https://www.seattletimes.com/seattle-news/politics/the-political-vaccine-divide-in-washington-state-is-widening-and-covid-rushes-in/ (last accessed Sept. 20, 2021).

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 6**

proclamations and the protections and programs subsequently enacted by the Legislature." Proc. 21-09, ¶ 23. With respect to COVID-19-related rent that accrued from February 29, 2020, the Bridge Proclamation continues to prohibit eviction proceedings based in part on unpaid rent if the landlord has "no attempt" to establish a "reasonable repayment plan" with a tenant, as defined by SB 5160, or the landlord and tenant cannot agree on a plan and no local eviction resolution pilot program exists per SB 5160. *Id.* at ¶ 31. Further, before a landlord may pursue eviction proceedings, a tenant must be provided with, and must reject or fail to respond within 14 days of receipt of, a notice of an opportunity to participate in the rental assistance program and eviction resolution pilot programs established by SB 5160. The programs must be operational at the time the notice is sent. *Id.*; ¶ 25.

### C. <u>Plaintiffs in This Action</u>

Plaintiffs in this action are landlords and property managers in Yakima, Washington. Plaintiff Enrique Jevons is the managing member of Jevons Properties, LLC, an entity that owns and rents several hundred residential properties and also manages rental units for other real property owners. At the time of Plaintiffs' filing, Jevons Properties, LLC had 171 tenants who were not current with their rent. The total amount of rent owed and unpaid to the entity, as of April 2021, was $266,509.98.

Plaintiff Freya K. Burgstaller is the trustee of the Freya K. Burgstaller Revocable Trust. The Trust owns twelve residential properties in Yakima. In March 2020, Ms. Burgstaller attempted to evict a tenant who had stopped paying rent and created enough noise in her unit that a neighboring tenant complained. During the eviction process, the eviction moratorium came into effect and the proceedings were halted. Since then, Ms. Burgstaller has been unable to pursue eviction and the tenant has remained on the property, despite noise complaints.

Plaintiffs Jay and Kendra Glenn are owners of forty-six residential rental properties in Yakima. Most of the Glenns's rental units are lower-cost units, which

cost approximately $650 and $750 per month. The average market rate for a one-bedroom unit in Yakima for fiscal year 2020 was $769. The total amount due to the Glenns from nonpaying tenants, at the time of filing, was $99,728.

The demand for rental housing in Yakima is high, in part from a shortage of rental properties. Throughout the moratorium, Plaintiffs have remained subject to state and local property taxes, in addition to paying utilities, mortgages, and maintaining and repairing their rental properties. In the personal experience of several Plaintiffs, tenants are hesitant to provide financial information or details regarding their health to their landlords, making it difficult to establish reasonable payment plans for individual tenants. Plaintiffs have not availed themselves of the SB 5160 programs now operational in Yakima County.

## II.    Procedural History

Plaintiffs filed the above-captioned lawsuit against Defendants on October 29, 2020, ECF No. 1, and a subsequent Amended Complaint on May 3, 2021, alleging that Washington's eviction moratorium violated provisions of the Washington State Constitution and United States Constitution, ECF No 27. They claimed the moratorium offends the Contracts Clause of the U.S. Constitution; Takings Clause of the Fifth Amendment to the U.S. Constitution; Takings Clause of the Washington State Constitution; and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Id.* Defendants filed an Answer to the Amended Complaint denying all claims on May 11, 2021. ECF No. 29.

Plaintiffs filed their Motion for Summary Judgment on April 30, 2021. ECF No. 22. Defendants filed their Cross-Motion for Summary Judgment on May 21, 2021. ECF No. 30. The parties also submitted supplemental briefing on the impact of *Cedar Park Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063 (2021). ECF Nos. 48, 52, 55, 60. The Court heard oral argument on the motions by videoconference on August 24, 2021.

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 8**

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex Corp.*, 477 U.S. at 323. The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Where, as here, parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Accordingly, it is the district court's duty to "review each cross-motion separately . . . and review the evidence submitted in support of each cross-motion." *Id.*

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 9**

## IV.    Discussion

The Court finds, and the parties appear to agree, that no material disputes of fact preclude summary judgment in this matter. The Court thus turns to the merits of the parties' arguments.

### A. **Jurisdiction**

#### 1.  Whether Plaintiffs' Claims are Moot

Defendants argue that the Court lacks jurisdiction to consider Plaintiffs' claims in this action because they are mooted by cessation of Proclamation 20-19.6, which formally ended on June 30, 2021. Defendants also formerly contended that Plaintiffs lacked Article III standing because their purported injuries were not traceable to the Washington eviction moratorium, as opposed to the federal eviction moratorium.

In contrast, Plaintiffs contend that their claims are not moot because the state eviction moratorium continues—albeit under different conditions—through the Governor's Bridge Proclamation. The heart of their argument is that, because "the inability to treat rent as an enforceable debt for the time period of the [moratorium] continues," so does their injury and the controversy in this action. ECF No. 37 at 11. With respect to Defendants' standing claim, Plaintiffs previously argued that their injury was directly traceable to Washington's eviction moratorium because the state moratorium was more restrictive than its federal counterpart.

#### a.  *Legal Standard*

A case becomes moot "'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). A party asserting mootness "bears the heavy burden of establishing that there remains no effective relief a court can provide." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017). "'The question is not whether the precise relief sought at the time the case was filed is still available,' but 'whether there can

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 10**

be any effective relief.'" *Id.* (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015)). Standing and mootness are similar doctrines in some respects: "Both require some sort of interest in the case, and both go to whether there is a case or controversy under Article III." *Jackson v. Calif. Dep't of Mental Health*, 399 F.3d 1069, 1072 (9th Cir. 2005); *United States v. Sanchez-Gomez*, ___ U.S. ___, 138 S.Ct. 1532, 1537 (2018) ("A case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III,' and is outside the jurisdiction of the federal courts.").

b. *Discussion*

In this case, Plaintiffs' claims are not moot. The Bridge Proclamation, which is operational until September 30, 2021, represents a continuation of several provisions that Plaintiffs allege are unconstitutional. Under the Bridge Proclamation, eviction proceedings based in part on rent that accrued from February 29, 2020 are prohibited until the SB 5160 rental assistance and eviction resolution pilot programs are operational and a landlord has attempted to establish a reasonable repayment plan with a tenant. Proc. 21-09, ¶¶ 25, 42–45 The tenant must also be given notice of the opportunity to participate in the programs prior to eviction. *Id.* at ¶ 25. Further, for rent accruing on August 1, 2021 through September 30, 2021, the Bridge Proclamation prohibits Plaintiffs from seeking eviction unless they have presented a reasonable repayment plan to a tenant and none of the following are applicable: a tenant (1) has made full payment of rent; (2) has made partial payment of rent based on their individual economic circumstances, as negotiated with the landlord; (3) has a pending application for rental assistance; or (4) resides in a jurisdiction in which the rental assistance program is anticipating receipt of additional resources but has not yet started their program or the program is not yet accepting new applications for assistance. *Id.* at ¶ 35. The Bridge Proclamation also continues to limit permissible uses of security deposits until landlords and tenants have the opportunity to resolve nonpayment

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 11**

through the SB 5160 programs, and it continues to prohibit the leveraging of fees for late rent payment during the period of the emergency (from February 29, 2020 to September 30, 2021). *Id.* at ¶¶ 34, 39.

These limitations speak to the heart of Plaintiffs' claims that the moratorium violates their property rights, contractual rights, and due process rights. Although the Bridge Proclamation extends the state eviction moratorium under different conditions, the transition did not moot Plaintiffs' claims. The precise relief sought by Plaintiffs is different at this juncture, but the Court could still fashion effective relief with respect to the Bridge Proclamation. *See Bayer*, 861 F.3d at 862. Because the Bridge Proclamation extends several actions challenged by Plaintiffs as unconstitutional, the Court is unable to find that Plaintiffs' claims are moot by cessation of Proclamation 20-19.6. Plaintiffs have demonstrated that their claims are not moot, and the Court has jurisdiction to consider them.

In addition, since the parties filed briefs in this matter, the federal eviction moratorium ended pursuant to the U.S. Supreme Court's decision to vacate a stay of enforcement in *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. ____, 141 S.Ct. 2320 (2021). Because the federal eviction moratorium is inoperative, it cannot be the source of Plaintiffs' injuries in this case and Defendants' argument that Plaintiffs lack standing is unpersuasive. For this reason, Plaintiffs' purported injury is traceable to the state eviction moratorium and Plaintiffs have standing.

2.  Whether Plaintiffs' Claims Against the Governor are Barred by the Eleventh Amendment

Defendants maintain that the doctrine of sovereign immunity acts as a jurisdictional bar to Plaintiffs' claims against Washington State Governor Jay Inslee. They contend that Governor Inslee does not have a "fairly direct" connection to enforcement of the eviction moratorium. In contrast, Plaintiffs argue that Governor Inslee's enforcement connection is sufficiently direct to overcome

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 12**

sovereign immunity, in part because the Washington State Constitution expressly provides that the governor "shall see that the laws are faithfully executed." Wash. Const. art. III, § 5.

### a. *Legal Standard*

The Eleventh Amendment to the U.S. Constitution acts as a jurisdictional bar to lawsuits brought by private citizens against state governments absent the state's consent. U.S. Const. amend. XI; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *Sofamor Danek Grp., Inc. v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997). In the seminal case *Ex Parte Young*, 209 U.S. 123 (1908), the U.S. Supreme Court permitted an action for prospective injunctive relief against state officials who had a proven connection to enforcing the challenged under the legal "fiction" that a suit against the individual was not a suit against the state. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269–270 (1997) (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 114, n.25 (1984)). To overcome the protections of sovereign immunity to sue a state official, a plaintiff must demonstrate that the official "[has] some connection with the enforcement of the act[.]" *Ex Parte Young*, 209 U.S. at 157. Under the *Young* doctrine, the enforcement connection "must be fairly direct," and a "generalized duty to enforce state law or general supervisory powers over the person responsible for enforcing the challenged provision" does not suffice. *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

### b. *Discussion*

In this case, sovereign immunity bars the present suit against Governor Inslee. Ninth Circuit precedent makes clear that—although a state governor may be ultimately responsible for executing and enforcing the laws of a state—the duty of general enforcement does not establish the "requisite enforcement connection" to overcome sovereign immunity. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (finding that the California

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 13**

Governor was immune from suit with respect to claims for injunctive relief because "his only connection to [the relevant statute] [was] his general duty to enforce California law"), *cert. denied*, 135 S.Ct. 398 (2014); *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) (finding that the "suit is barred against the Governor . . . as there is no showing that they have the requisite enforcement connection"), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002); *Los Angeles Cnty. Bar Ass'n*, 979 F.2d at 704 (citing *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992) (holding that the "connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit"); *see also Nat'l Conf. of Pers. Managers, Inc. v. Brown*, 690 F. App'x 461, 463 (9th Cir. 2017). "Were the law otherwise, the exception would always apply[ ]" and "[g]overnors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex Parte Young*." *Tohono O'Odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015). In short, a more direct connection to enforcement of the law is required, and the Eleventh Amendment bars suit against Governor Inslee. Accordingly, Governor Inslee is dismissed from this action.

Defendants do not appear to challenge whether Attorney General Ferguson is properly named in this suit, and the Court agrees sovereign immunity is not a jurisdictional bar as to the Attorney General. *Cf. Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004) (holding that the Idaho Attorney General was properly named under *Ex Parte Young* because, unless the county prosecutor objected, the Attorney General had power to perform every act the county attorney could perform); *Bolbol v. Brown*, 120 F. Supp. 3d 1010, 1018–19 (N.D. Cal. 2015) (holding that the California Attorney General was not entitled to Eleventh Amendment immunity because under the state constitution the Attorney General not only has "direct supervision over every district attorney" but also has

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 14**

the duty to "prosecute any violations of the law … [and] shall have all the powers of a district attorney").

### 3. Whether the Court Has Jurisdiction to Enjoin Purported Violations of the Washington Constitution

The parties now agree that the Court lacks jurisdiction to enjoin purported violations of the Washington Constitution. *See* ECF No. 37 at 14. As a result, the Court dismisses Plaintiffs' Third Claim for Relief on the grounds of state sovereign immunity and federalism, as embodied in the Eleventh Amendment.

## B. **First Cause of Action: Contracts Clause of Article I, § 10 of the U.S. Constitution**

### 1. Whether the Eviction Moratorium Violates the Contracts Clause

Of their substantive claims, Plaintiffs first argue that Washington's eviction moratorium violates the Contracts Clause of Article I, § 10 of the U.S. Constitution. Plaintiffs argue that the eviction moratorium violates the Contracts Clause because it substantially impairs their landlord-tenant contracts. They contend that the ability to evict is the "cornerstone" of their contractual bargain and the moratorium eliminates all practical remedies for contractual violations. ECF No. 22 at 23. Plaintiffs cite mostly pre-*Blaisdell* decisions, including *Bronson v. Kinzie*, 42 U.S. 311 (1843), for the principle that a contractual impairment may be substantial even when remedies for contractual breaches are merely delayed. ECF No. 22 at 24; *see generally Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). Plaintiffs further assert that the moratorium is not a reasonable and necessary means to address Washington's stated interest. ECF No. 22 at 27. Their primary contention is that, because the moratorium protects *all* renters and there is no requirement that a renter attest to loss of income or health impacts from the COVID-19 pandemic, the moratorium is not sufficiently tailored to Defendants' purpose. *Id.* at 24–25.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 15**

In contrast, Defendants argue that the moratorium does not impose a substantial, unforeseeable impairment on Plaintiffs' rental agreements. ECF No. 30 at 43–48. Specifically, Defendants claim that the eviction moratorium does not undermine Plaintiffs' contractual bargain or impair Plaintiffs' reasonable expectations, and also that Plaintiffs may safeguard or reinstate their contractual rights. *Id.* Defendants respond that the means of the moratorium is appropriate because it was intended to have broad public benefits, including protection of the state's economy and public health. ECF No. 30 at 50–51, 53. Defendants chiefly cite *Blaisdell* in support of the contention that the moratorium fits the Supreme Court's standard for a reasonable and appropriate law, especially during a period of emergency. *See id.* at 53.

a.  *Legal Standard*

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Yet, the Contracts Clause is not "the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). Modern Contracts Clause jurisprudence is based on the "watershed decision" of *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, __ F.4th __, No. 20-56251, 2021 WL 3745777, at *5 (9th Cir. Aug. 25, 2021). In the case of *Blaisdell*, the U.S. Supreme Court "upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the 'legitimate end' of protecting 'a basic interest of society.'" *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987). Pertinent Contract Clauses cases consist of *Blaisdell* and its progeny, which conceptualize a radically different idea of the Clause than in pre-*Blaisdell* jurisprudence. Post-*Blaisdell*, "the Supreme Court has construed [the Contracts Clause] prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively."

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 16**

*Matsuda v. Cty. & Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008); *Allied Structural Steel Co.*, 438 U.S. at 240 ("[T]he [state's] police power[ ] is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.") (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905)).

To determine whether legislation violates the Contracts Clause, federal courts deploy a "two-step test." *Sveen v. Melin*, __ U.S. __, 138 S. Ct. 1815, 1821–22 (2018). First, "[t]he threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Id.* (quoting *Allied Structural Steel Co.*, 438 U.S. at 244). Under this inquiry, relevant factors include "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. Second, if the law constitutes a substantial impairment of a contractual relationship, the court must turn to the "means and ends of the legislation." *Id.* The court should determine whether the legislation is drawn in an "'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–412 (1983)). Under this second step, courts apply a heightened level of scrutiny when the government is a contracting party. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25–26 (1977). When the government is not party to the contract being impaired, as is here, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 413 (quotations omitted); *see also Keystone Bituminous*, 480 U.S. at 505; *Apartment Ass'n of Los Angeles Cnty.*, 2021 WL 3745777 at *5; *Lazar v. Kroncke*, 862 F.3d 1186, 1199 (9th Cir. 2017).

//

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 17**

b. *Discussion*

In this case, there is no dispute that Plaintiffs have valid landlord-tenant agreements that are subject to the Contracts Clause. Accordingly, the Court turns to the two-step test re-articulated in *Sveen*.

i.    <u>Substantial Impairment</u>

The Court finds that Washington's eviction moratorium does not substantially impair Plaintiffs' lease agreements for three reasons. First, the moratorium does not undermine Plaintiffs' contractual bargain with their tenants. The moratorium delays the ability of Plaintiffs to exercise certain statutory remedies. Mere delay is insufficient to materially alter the lease agreements in a manner that violates the Contracts Clause. *Blaisdell* is a strikingly similar case that is directly applicable. 290 U.S. 398 (1934). In *Blaisdell*, the U.S. Supreme Court upheld a Depression-era mortgage moratorium law extending mortgagors' redemption period for up to two years. *Id.* at 439. It reasoned that while contractual obligations may be "impaired by a law which renders them *invalid, or releases or extinguishes* them[,]" such as a "state insolvent law" that wholly "discharge[s] the debtor from liability" for preexisting debts, the mortgage moratorium did not impose an impairment on the plaintiffs' contractual rights. *Id.* at 439 (emphasis added). In that case, the U.S. Supreme Court also distinguished the case cited by Plaintiffs, reasoning that the Court in *Bronson* did not consider states' interests in exercising police powers to "safeguard the vital interests of its people." *Id.* at 434. Indeed, the *Blaisdell* Court made clear that changing socioeconomic circumstances may alter the boundaries of the state's police power. *Id.* at 442.

In this case, the eviction moratorium does not extinguish the contractual obligations of tenants to landlords, but temporarily restrains enforcement through eviction and debt collection during a period of "great public calamity." *Id.* The moratorium is only a "temporary restraint of enforcement . . . to protect the vital interests of the community"—that is, protecting the public from a homelessness

epidemic unseen since the Great Recession and preventing further transmission of COVID-19. *See id.* at 439. The moratorium's plain language does not extinguish or release tenants' obligations to pay past-due rent. The moratorium delays the remedy of eviction for failure of a tenant to pay *timely* rent during the period of the health-emergency-based restriction. It is also significant to note that Proclamation 20-19.6 expressly provided that landlords and property managers had the right to treat unpaid rent as enforceable debt immediately if they "demonstrate[d] . . . to a court that the resident was offered, and refused or failed to comply with" a reasonable payment plan. Proc. 20-19.6, ¶ 35. Under the active Bridge Proclamation, past-due rent may be treated as an enforceable debt once a repayment plan has been offered, the SB 5160 programs are implemented, and a tenant has been offered, and rejected or failed to respond to, an opportunity to participate in the programs. In Yakima, the SB 5160 programs are fully operational and Plaintiffs may treat unpaid rent or other charges as an enforceable debt that is owing and collectible after following these procedures. In either scenario, as a matter of law, Plaintiffs are incorrect in their assertion that the moratorium prohibits them "from treating unpaid rent as an enforceable debt and bringing a breach-of-contract action." ECF No. 22 at 28.

Second, the eviction moratorium does not impair reasonable expectations of Plaintiffs in their contracts. Under this factor, courts consider "whether the industry the complaining party has entered has been regulated in the past." *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411–12. The landlord-tenant relationship, and housing industry generally, is heavily regulated in Washington. The Residential Landlord-Tenant Act, Chapter 59.18 RCW, regulates the relationship by, *inter alia*, establishing a duty to keep the premises fit for human habitation, Wash. Rev. Code § 59.18.060; requiring notice of rent increases, *id.* § 59.18.140, and termination, *id.* § 59.18.200; and regulating late fees, *id.* § 59.18.170, tenant screenings, *id.* § 59.18.257, and security deposits, *id.* § 59.18.260–.280. Significantly, Chapter

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 19**

59.12 RCW (Forcible Entry and Forcible and Unlawful Detainer), and the Residential Landlord-Tenant Act, both regulate when eviction of tenants is permissible. Wash. Rev. Code §§ 59.12, 59.18.365–.410. In this case, the State's pervasive regulation in this field has placed Plaintiffs on notice that they may face further government intervention. That is particularly true where, as here, the eviction moratorium regulates the same industry topics (permissible use of unlawful detainer proceedings, late fees, and security deposits) and shares the same legislative intent to protect the rights of tenants in the rental relationship. Consequently, this factor also indicates that the eviction moratorium does not violate the Contracts Clause.

Third, Plaintiffs may safeguard and reinstate their contractual rights during and subsequent to the eviction moratorium. A law altering contractual remedies without nullifying them does not "prevent[] the party from safeguarding or reinstating [their] rights." *Sveen*, 138 S. Ct. at 1822. As delineated previously, the eviction moratorium did not extinguish Plaintiffs' contractual rights. Put bluntly, the moratorium delays the use of particular tools to enforce certain contractual obligations for the time of the state of emergency. The eviction moratorium does not eliminate tenants' obligations to pay rent or Plaintiffs' rights to collect past-due rent. And contrary to Plaintiffs' representations, Plaintiffs may treat unpaid rent as an enforceable debt during the moratorium after following the above-noted procedures. Because the moratorium does not nullify contractual remedies, the eviction moratorium does not impair Plaintiffs' ability to safeguard their contractual rights in their rental agreements.

Due to the foregoing, the Court finds that the eviction moratorium does not substantially impair Plaintiffs' lease agreements. Even if the Court were to find that the moratorium operated to substantially impair Plaintiffs' contractual rights, Plaintiffs' Contracts Clause claim fails because the eviction moratorium advances

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 20**

1    a significant and legitimate public purpose in an appropriate and reasonable way.

2    Each element is discussed in turn.

3                            ii.    <u>Significant and Legitimate Purpose Public</u>

4            Each of Washington's proffered reasons for the eviction moratorium are

5    significant and legitimate public objectives. On its face, Proclamation 20-19.6

6    states that its purpose is to "reduce economic hardship" of those "unable to pay

7    rent as a result of the COVID-19 pandemic" and "promote public health and safety

8    by reducing the progression of COVID-19 in Washington State." Proc. 20-19.6, ¶¶

9    13, 15. The Bridge Proclamation extends this purpose with the goal of "reduc[ing]

10   uncertainty" as the state implements a long-term post-COVID-19 housing recovery

11   strategy. Proc. 21-09, ¶ 23.

12           Here, the state's purpose of preventing transmission of COVID-19 is not

13   only significant and legitimate, but compelling. *See, e.g.*, *Roman Catholic Diocese*

14   *of Brooklyn v. Cuomo*, __ U.S. __, 141 S. Ct. 63, 67 (2020) (per curiam)

15   ("Stemming the spread of COVID–19 is unquestionably a compelling

16   interest . . . ."); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th

17   Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases

18   clearly constitutes a compelling interest."). The eviction moratorium also seeks to

19   address the economic and social fallout from the gravest public health crisis in a

20   century. The Governor's Office was particularly concerned with the impact of

21   COVID-19, and all its economic consequences, on housing and the homelessness

22   crisis. It cannot seriously be argued that these objectives do not serve the public

23   and that they do not constitute significant and legitimate purposes of the state.

24   Consequently, the Court finds that Defendants have articulated a significant and

25   legitimate public purpose for the eviction moratorium.

26                           iii.    <u>Appropriate and Reasonable Means</u>

27           The eviction moratorium is also an appropriate and reasonable measure to

28   address the state's objectives. Since Washington is not a party to the contracts

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT . . . \* 21**

under review, the Court must "defer" to the government's "judgment as to the necessity and reasonableness of a particular measure." *Energy Rsrvs. Grp.*, 459 U.S. at 412–13. Such "latitude 'must be especially broad" where "officials 'undertake to act in areas fraught with medical and scientific uncertainties," such as responding to the COVID-19 pandemic. *S. Bay United Pentecostal Church v. Newsom*, __ U.S. __, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). Provided that the limits of the Contracts Clause are not exceeded, the Court should decline to engage in second-guessing, as the "unelected federal judiciary" lacks the "background, competence, and expertise to assess public health." *Id.* (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

On this point, Plaintiffs argue that the moratorium is not reasonable and appropriate because it applies "regardless of a tenant's employment or ability to pay." ECF No. 22 at 18. This argument misses the forest for the trees. Regardless of the pandemic's impact on any specific individual's financial or health circumstances, one of the moratorium's express intentions is to reduce person-to-person contact to mitigate transmission of COVID-19. At least one study's projections indicated that mass evictions could have resulted in up to 59,008 more eviction-attributable COVID-19 cases, 5,623 more hospitalizations, and 621 more deaths in Washington. ECF No. 35-1 at 64–65. Further, the reasonableness of the state's public purpose of preventing homelessness during the pandemic is directly supported by *Blaisdell*, where the Supreme Court upheld a similar law enacted during an "emergency" that "threaten[ed] the loss of homes." 290 U.S. at 444–45.

Plaintiffs also maintain that the eviction moratorium places an unreasonable burden of its public benefit on landlords and property managers. But virtually every law "regulating commercial and other human affairs . . . creates burdens for some that directly benefit others." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986). Simply because the moratorium "requires one person to use

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . .** * 22

his or her assets for the benefit of another" does not raise the eviction moratorium to a level of unconstitutionality under the Contracts Clause. *Id.* It does not serve special interests but seeks to protect the basic interest of society in preventing mass evictions and housing instability, *id.*, and preventing the further spread of COVID-19.

For all these reasons, and in accordance with the numerous other district courts that have considered constitutional challenges to state eviction moratoria, the Court finds that Washington's moratorium is an appropriate and reasonable response to the state's significant and legitimate public purpose of preventing spread of COVID-19 and exacerbation of the homelessness crisis. *See, e.g.*, *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 355 (E.D. Pa. 2020) (finding that "as in *Blaisdell*, where temporary measures enacted in response to emergency conditions to allow people to remain in their homes under certain conditions was upheld in response to a Contracts Clause challenge, [plaintiff's] Contracts Clause challenge to the City's temporary legislation, enacted in response the COVID-19 pandemic and designed to allow residents to remain in their homes, is unlikely to succeed on the merits"); *El Papel LLC v. Inslee*, No. 2:20-CV-01323-RAJ-JRC, 2020 WL 8024348, at *7 (W.D. Wash. Dec. 2, 2020), *report and recommendation adopted*, No. 2:20-CV-01323-RAJ-JRC, 2021 WL 71678 (W.D. Wash. Jan. 8, 2021) ("*Blaisdell* supports the reasonableness of [Washington's Moratorium]."). The Court declines to second-guess the expertise of the state in formulating an appropriate response to the present public health emergency, which is fraught with medical and scientific uncertainties. Accordingly, Defendants are entitled to judgment as a matter of law and the Court grants summary judgment in favor of Defendants on the Contracts Clause claim.

//

//

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 23**

### C. Second Cause of Action: Takings Clause of the Fifth Amendment to the U.S. Constitution

Plaintiffs' next cause of action contends that the eviction moratorium constitutes a *per se* physical taking of their property rights under the Fifth Amendment to the U.S. Constitution. Plaintiffs do not request monetary damages in this action. Instead, they request the Court grant declaratory relief that a "taking" has occurred, so that they may begin the process to acquire "just compensation." Their core Takings Clause claim is that the eviction moratorium leads to a physical invasion of private property and thereby "takes" Plaintiffs' right to exclude. ECF No. 22 at 6–11. They cite *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S. Ct. 2063 (2021) to support their assertion that the moratorium constitutes a physical taking. ECF No. 48 at 2–9. Plaintiffs also argue that the eviction moratorium amounts to a *per se* taking because it appropriates their property rights in their rental contracts and security deposits. *Id.* at 11–12.

Defendants argue that the eviction moratorium is not a *per se* taking because the state has not physically invaded Plaintiffs' properties or otherwise appropriated their property rights. They contend that *Cedar Point Nursery* is factually and legally distinguishable and the case actually reaffirms the U.S. Supreme Court's prior holdings that regulations restricting the use of property without a physical invasion of land, particularly when the use is premised on the owner's voluntary invitation to an occupant, are not *per se* takings. ECF No. 56 at 2–5. Defendants also claim that the U.S. Supreme Court's *per se* takings jurisprudence does not apply to property interests in contracts, and nonetheless, the eviction moratorium appropriated neither Plaintiffs' contractual rights nor security deposits. ECF No. 30 at 36–38.

//

//

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 24**

1

2

3    1.    <u>Whether Declaratory Relief is Available to Plaintiffs</u>

a.    *Legal Standard*

The Takings Clause prohibits a state from taking private property for public use "without just compensation." U.S. Const. amend. V. Accordingly, "[e]quitable relief is not available to enjoin an alleged taking of private property for public use . . . when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)); *accord Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 740 (2010) (Kennedy, J., concurring). The U.S. Supreme Court reasoned in *Knick v. Township of Scott, Pa.*, 588 U.S. ___, 139 S. Ct. 2162 (2019) that, "[t]oday, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id.* at 2176–77. The Court concluded that "a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under [42 U.S.C.] § 1983 at that time." *Id.* at 2177.

b.    *Discussion*

The Court first considers whether the declaratory relief sought is available to Plaintiffs. In this case, Plaintiffs do not seek proper relief for a Fifth Amendment taking. Plaintiffs seek declaratory relief that a taking has occurred, not monetary damages. As other federal district courts have found, such relief is inappropriate because it would be the functional equivalent of an injunction against enforcement of the moratorium. *See, e.g.*, *Baptise v. Kennealy*, 490 F. Supp. 3d 353, 391 (D. Mass. 2020); *County of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 2769105, *4 (W.D. Pa. May 28, 2020); *HAPCO*, 482 F. Supp. 3d at 358, 358 n.112. The

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 25**

declaratory judgment sought by Plaintiffs is indisputably a type of equitable remedy. *Apache Survival Coalition v. United States*, 21 F.3d 895, 905 n.12 (9th Cir. 1994). Accordingly, the relief sought by Plaintiffs is foreclosed by the Supreme Court's decision in *Knick*, 139 S. Ct. at 2177. The remedy for a taking under the Fifth Amendment is damages, not equitable relief.[3] For this reason, the Court is unable to grant the relief sought by Plaintiffs.

2.  <u>Whether the Eviction Moratorium Constitutes a *Per Se* Physical Taking</u>

a.  *Legal Standard*

The Fifth Amendment's Takings Clause applies to the states through the Fourteenth Amendment. *Murr v. Wisconsin*, __ U.S. __, 137 S. Ct. 1933, 1942 (2017); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005). As previously stated, the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Under the Takings Clause, there are traditionally two categories of takings, (1) *per se* physical takings, and (2) regulatory takings. To summarize:

> Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.'"

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002) (internal citations omitted). "The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. Escondido*, 503

---

[3] It is worth noting that the Washington State Constitution provides an avenue for obtaining compensation via damages for the alleged taking of property. Wash. Const. art. I, § 16. Plaintiffs have not attempted to acquire just compensation for the purported taking through available state procedures.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 26**

U.S. 519, 523 (1992). "This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.

Under the first category of *per se* physical takings, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary." *Id.* The U.S. Supreme Court acknowledged that the same was true when the government physically appropriated part of a rooftop to provide cable TV access for apartment tenants in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and where the government used its planes in private airspace to approach a government airport in *United States v. Causby*, 328 U.S. 256 (1946). *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.

Under the second category of regulatory takings, which contrasts with the categorical *per se* takings rule, courts consider complex factual assessments of the purposes and economic effects of governmental actions. *Id.* at 323 (quoting *Yee*, 503 U.S. at 523). The seminal regulatory takings case is *Penn Central Transp. Co. v. City of New York*, 439 U.S. 883 (1978). Plaintiffs do not challenge the moratorium as a regulatory taking and, for this reason, the Court does not extrapolate the *Penn Central* standard here. *Accord Yee*, 503 U.S. at 536–37.

In *Loretto*, a *per se* takings case, the U.S. Supreme Court considered a challenge to a New York statute requiring that landlords permit a cable television company to install television facilities on their properties, and which prohibited

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 27**

demands for payment from the company in excess of an amount determined reasonable by the state commission. *Loretto*, 458 U.S. at 423. The petitioner brought a class action for damages, alleging that the statute constituted a taking. *Id.* The question for the U.S. Supreme Court was "whether an otherwise valid regulation so frustrates property rights that compensation must be paid." *Id.* at 425–26 (citing *Penn. Central Transp. Co.*, 439 U.S. at 127–28). The U.S. Supreme Court's decision hinged firmly on its interpretation of the third *Penn Central* factor, which considers the "character" of the governmental action. *Id.* at 429–430. The Court concluded that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve," *id.* at 426, and that there was invariably a taking because the statute mandated the permanent physical occupation of real property, *id.* at 427. The Court's reasoning relied heavily on the distinction between a permanent occupation and temporary physical invasion. *Id.* at 434 (citing *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980)). While a temporary physical invasion is subject to a balancing process under the three *Penn Central* factors, "when the 'character of the governmental action[ ]' is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434–35 (internal citation omitted). Thus, the Court held in *Loretto* that "permanent physical invasions" are *not* subject to balancing under the remaining *Penn Central* factors and are instead *per se* takings.

Subsequent to *Loretto*, the U.S. Supreme Court decided *Yee v. City of Escondido, California*, 503 U.S. 519 (1992). The petitioners in *Yee* were mobile home park owners in Escondido, California, who rented pads of land to mobile homeowners. *Id.* at 523. California's Mobilehome Residency Law limited the reasons that a park owner could terminate a mobile homeowner's tenancy to (1) nonpayment of rent; and (2) the park owner's desire to change the use of his or her

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 28**

land. *Id.* at 524. The City also had a rental control ordinance that prohibited rent increases absent the City Council's approval. *Id.* at 524–25. Petitioners argued that the local rent ordinance, in conjunction with the Mobilehome Residency Law, amounted to a *per se* physical taking. *Id.* at 523–24. The U.S. Supreme Court held that the rent control ordinance did not authorize an unwanted physical occupation of petitioners' property and therefore did not amount to a *per se* taking. *Id.* at 532. The Court rejected petitioners' argument that the rental control ordinance authorized a physical taking because the law, in conjunction with the state law's restrictions, granted a homeowner a right to occupy the pad indefinitely at a submarket rent. In rejecting this argument, the Court reasoned that a physical taking occurs "only when [the government] *requires* the landowner to submit to physical occupation of his land." *Id.* at 527 (emphasis in original). The petitioners were not compelled by the city or state to continue renting their properties. *Id.* The Court determined that, because the laws merely regulated petitioners' *use* of their land by regulating the relationship between landlord and tenant, they could not be squared with the Court's physical takings cases. *Id.* at 527–28. The U.S. Supreme Court concluded: "This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Id.* at 528–29 (quoting *Loretto*, 458 U.S. at 440); *Florida Power Corp.*, 480 U.S. at 252 ("[S]tatutes regulating the economic relations of landlords and tenants are not *per se* takings.").

The U.S. Supreme Court issued a more recent decision concerning the Takings Clause in *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S. Ct. 2063 (2021). In *Cedar Point Nursery*, the Court held that a California access regulation that gave outside labor organizers a right to "take access" to agricultural employers' property was a *per se* physical taking because it appropriated property owners' "right to exclude," both for the government itself and for third parties. *Id.*

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 29**

at 2072 (quoting Cal. Code. Regs., tit. 8, § 20900(e)(1)(C) (2020)). The regulation required agricultural employers to permit union organizers on their property for three hours a day, 120 days per year, for the purpose of soliciting employees to join or form a union. *Id.* at 2069. The Court reasoned that the occupation was a physical taking because it impacted the right to exclude, which is the "sine qua non" of property. *Id.* at 2072–73. The Court rejected the notion that the failure of the regulation to invade the property right "around the clock" made the taking any less a taking under the Fifth Amendment. *Id.* at 2075. Through *Cedar Point Nursery*, it appears the Court implicitly overruled its previous rationale under *per se* jurisprudence that distinguished between "permanent physical occupations" and "temporary physical invasions." *See Loretto*, 458 U.S. at 434 (citing *PruneYard Shopping Center*, 447 U.S. at 74).

b. *Discussion*

Even if the Court were to find that declaratory relief was available to Plaintiffs, the Court finds that Washington's eviction moratorium does not constitute a *per se* physical taking under the Takings Clause. With respect to Plaintiffs' assertion regarding physical occupation, the moratorium does not constitute a *per se* taking because the moratorium did not require Plaintiffs to submit to physical occupation or invasion of their land and did not appropriate Plaintiffs' right to exclude. The U.S. Supreme Court has made clear that "statutes regulating the economic relations of landlords and tenants are not *per se* takings." *Florida Power Corp.*, 480 U.S. at 252. No physical invasion has occurred beyond that agreed to by Plaintiffs in renting their properties as residential homes, which is naturally subject to regulation by the state. Like traditional regulatory takings cases, the moratorium "transfers wealth from the landlord to the tenants by reducing the landlords' income and the tenants' monthly payments." *Yee*, 503 U.S. at 529. But, as the Supreme Court stated in *Yee*, the existence of the wealth transfer "in itself does not convert regulation into physical invasion." *Id.* at 530. To find

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 30**

that the eviction moratorium is a *per se* physical taking would require the Court to disregard the U.S. Supreme Court's holdings and rationale in both *Loretto* and *Yee*; it would essentially require the Court to eliminate the line between the U.S. Supreme Court's *per se* takings and regulatory takings jurisprudence. Such activism is not the occupation of this Court.

Plaintiffs' attempt to distinguish *Yee* from this case fails, as the plaintiffs in *Yee* similarly argued that the ordinance required them to lease to tenants beyond their original lease terms. 503 U.S. at 526–27 ("Because under the California Mobilehome Residency Law the park owner cannot evict a mobile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park. . . ."). In this case, just as in *Yee*, Plaintiffs voluntarily invited tenants to occupy their properties as residential homes. The state has not required any physical invasion and their tenants were "not forced upon them by the government." *Id.* at 528. Plaintiffs' right to exclude has not been taken because the moratorium compelled no physical invasion or occupation that Plaintiffs would have forfeited in the first place. *See id.* at 532–33. Instead, the eviction moratorium regulates the landlord-tenant relationship once it is already established.

*Cedar Point Nursery* also does not disturb the Court's analysis. The California access regulation challenged in *Cedar Point Nursery* is distinguishable from the eviction moratorium in this case. Unlike the physical appropriation of the right to exclude in *Cedar Point Nursery*, the moratorium regulates the landlords "use of their land by regulating the relationship between landlord and tenant." *Yee*, 503 U.S. at 528. Based on the undisturbed precedent of *Yee*, limitations on how a landlord may treat tenants—which they have voluntarily invited onto their properties by renting to them—and enforce their contractual rights (for a temporary period) are readily distinguishable from regulations granting a *separate right* to invade property closed to the public or most individuals. *Id.* at 527–28, 531.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 31**

Second, central to the U.S. Supreme Court's decision in *Yee* and as already noted, Plaintiffs voluntarily invited tenants onto their properties. *Id.* at 531 ("Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals.), 527 ("Petitioners voluntarily rented their land to mobile home owners."), 528 ("Petitioners' tenants were invited by petitioners, not forced upon them by the government."). Plaintiffs' tenants were invited by themselves, not forced upon them by the government. *Id.* at 528. *Cedar Point Nursery* does not overrule *Yee* or undermine the legal underpinnings of *Yee*. Indeed, in *Cedar Point Nursery*, the Court cited *Yee* for general takings principles, and *Yee*'s holding is still binding law on this Court.

While *Cedar Point Nursery* announced that a non-continuous, intermittent easement created by California's access regulation affected a *per se* physical taking, it did not undermine or disturb the long-standing principle that "[t]he government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527. Because the moratorium does not commit a physical appropriation of Plaintiffs' land beyond that consented by Plaintiffs in renting their units as residential properties—an industry heavily regulated by the State of Washington—the eviction moratorium does not constitute a *per se* taking under the Fifth Amendment. *See S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*, No. 3:21-CV-912-L-DEB, 2021 WL 3171919, at *8 (S.D. Cal. July 26, 2021) (distinguishing *Cedar Point Nursery* and holding that plaintiff failed to show a likelihood of success on the merits on its Takings Clause claim challenging California's eviction moratorium).

Plaintiffs' argument that the eviction moratorium effects a taking in their rental contracts also fails. Plaintiffs cite regulatory takings case *Cienega Gardens v. United States*, (Fed. Cir. 2003) for their contention that the moratorium's impact on their contracts constitutes a *per se* taking. Such is an inapplicable framework for

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 32**

Plaintiffs' physical takings claim, as it is inappropriate for this Court to "treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322. Plaintiffs also cite eminent domain case *United States v. Petty Motor Company*, 327 U.S. 372 (1946). *Petty Motor Company* is unpersuasive because it is not factually analogous and involves physical occupation. In that case, the United States physically appropriated a property owner and tenant's leaseholds, requiring that the defendants submit their real property to the government's immediate possession. *Id.* at 374–75. Here, the eviction moratorium does not eliminate or relinquish a contractual right of Plaintiffs; indeed, the moratorium did not diminish a single tenant's debt obligation to Plaintiffs by even a penny. Plaintiffs' arguments on this point are not supported by law and are of no avail.

For a similar reason, the eviction moratorium does not take Plaintiffs' property interests in security deposits. Plaintiffs claim that by limiting available uses of the security deposit during the period of emergency to prevent deductions for past-due rent, Washington has committed a *per se* taking of its property interest in their tenants' security deposits. *See* ECF No. 22 at 12 (also arguing that the purpose of a security deposit is to reimburse landlords for unpaid rent at end of tenancy). The cases cited by Plaintiffs on this point concern actual confiscation of property by the government and are inapposite. *See, e.g.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 (2003) (holding that interest on interpleaded funds exacted by the government could be a *per se* taking); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164–65 (1980) (holding that confiscation of interest on client funds deposited into lawyers' trust accounts was a *per se* taking). As previously stated, the eviction moratorium does not extinguish Plaintiffs' property interest in collecting unpaid rent whatsoever. Plaintiffs also remain able to deduct charges from security deposits for other tenant violations of

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 33**

the Residential Landlord-Tenant Act, subject to state's accounting requirements. Wash. Rev. Code § 59.18.280. This contention is particularly unpersuasive because Plaintiffs can recover any amount they would otherwise deduct from a tenant's security deposit for unpaid rent by pursuing debt enforcement in accordance with the terms of the Bridge Proclamation and SB 5160. Washington is permitted to modify permissible uses of security deposits under its regulatory scheme, as it has done here, and it does not amount to a *per se* taking under the Fifth Amendment.

For the foregoing reasons, Plaintiffs' Fifth Amendment claim fails as a matter of law. The Court grants summary judgment in favor of Defendants.

### D. <u>Fourth Cause of Action: Due Process Clause of the Fourteenth Amendment to the U.S. Constitution</u>

Plaintiffs' final claim asserts two distinct arguments under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. Plaintiffs contend that the eviction moratorium violates the Due Process Clause because it is (1) unconstitutionally vague; and (2) "unduly oppressive" and thereby violative of substantive due process. ECF No. 22 at 32.

First, Plaintiffs argue that the eviction moratorium is impermissibly vague because it does not provide guidance as to how a landlord or property manager may construct a "reasonable payment plan" that is based on a tenant's individual financial, health, or other circumstances. Plaintiffs Jay Glenn and Enrique Jevons submitted declarations indicating that they have managed to create repayment plans with several tenants. ECF No. 37-1 at 3–4; ECF No. 37-2 at 2–3. Plaintiff Jevons stated that, previously, he had not attempted to even inquire about individual tenants' circumstances because it seemed "devious" on his part. ECF No. 37-2 at 2. The core of Plaintiffs' vagueness grievance is that they experience difficulty ascertaining individual tenants' financial or health circumstances, in part because tenants are not required to communicate with them. *Id.* at 2–3.

Defendants assert that the void for vagueness doctrine does not apply because due process only prohibits impermissibly vague laws with civil and criminal penalties. *See* ECF No. 30 at 59. Nonetheless, they further argue that the eviction moratorium's repayment plan provision provides constitutionally permissible "flexibility and reasonable breadth" to courts, and that its terms provide "fair notice" of what is expected of Plaintiffs. *Id.* at 60 (citations omitted).

Second, Plaintiffs assert that that the eviction moratorium is unduly oppressive of "Plaintiffs' right to determine the conditions upon which a person may continue to occupy the owner's property." ECF No. 22 at 34–35. They contend that they are "unjustifiably prevented from being able to rightfully use their properties and mitigate damages where tenants fail to pay rent." *Id.* at 37.

Defendants respond that Plaintiffs are barred from repackaging their Takings Clause and Contracts Clause claims into a substantive Due Process Clause claim because the former provide explicit textual sources of constitutional protection of the asserted rights. ECF No. 30 at 60–61. In addition, Defendants claim that Plaintiffs' substantive due process claim should not be analyzed under a heightened standard of scrutiny, as the challenge is based on Plaintiffs' economic interests. *See* ECF No. 30 at 57. Under the appropriate standard, they argue, the moratorium is not arbitrary or irrational for the same reasons it furthers a significant and legitimate public purpose. *Id.* at 58.

### 1. Whether the Eviction Moratorium is Unconstitutionally Vague

#### a. *Legal Standard*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend XIV. "'It is a basic principle of due process that an enactment is void for vagueness if its *prohibitions* are not clearly defined.'" *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289–90 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (emphasis added)). For example, a

1   conviction fails to comport with due process when the statute under which it is

2   obtained "fails to provide a person of ordinary intelligence fair notice of what is

3   *prohibited*, or is so standardless that it authorizes or encourages seriously

4   discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008)

5   (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)) (emphasis added). Where the

6   law "implicates First Amendment rights, . . . a 'more demanding' standard of

7   scrutiny applies." *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)

8   (quoting *Grayned*, 408 U.S. at 108). But "perfect clarity and precise guidance have

9   never been required even of regulations that restrict expressive activity." *Id.*

10   (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

11   A statute may be challenged as unconstitutionally vague on its face or as

12   applied to a particular party. *See United States v. Kilbride*, 584 F.3d 1240, 1256–59

13   (9th Cir. 2009). "Outside the First Amendment context, a plaintiff alleging facial

14   vagueness must show that the enactment is impermissibly vague in all its

15   applications." *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133,

16   1146 (9th Cir. 2009); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987)

17   (holding that a plaintiff mounting a facial challenge must establish that "no set of

18   circumstances exists under [ ] the Act [that] would be valid"). Since a plaintiff

19   mounting a facial attack to a statute must show that the law is impermissible in all

20   its applications, a plaintiff must first show that the law is unconstitutionally vague

21   as applied to them. *Castro v. Terhune*, 712 F.3d 1304, 1311 (9th Cir. 2013).

b.  *Discussion*

23   Under the Bridge Proclamation, for rent owed that accrued on or after

24   February 29, 2020 through September 30, 2021, a landlord is prohibited from

25   treating unpaid rent as an enforceable debt if the landlord "has made no attempt to

26   establish a reasonable repayment plan with the tenant per E2SSB 5160, or if they

27   cannot agree on a plan and no local eviction resolution pilot program per E2SSB

28   5160 exists." Proc. 21-09, ¶ 42. Further, a landlord is required to offer a tenant a

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 36**

"reasonable repayment plan" for rent accrued between August 1, 2021 and September 30, 2021 prior to enforcing any eviction notice pursuant to the order and Section 4 of SB 5160. *Id.* at ¶ 37. The Bridge Proclamation states that a "reasonable repayment plan" has the same meaning as "reasonable schedule for repayment" as defined under Section 4 of SB 5160. *Id.* at 43. More specifically, it refers to a "repayment plan or schedule for unpaid rent that does not exceed monthly payments equal to one-third of the monthly rental charges during the period of accrued debt." *Id.*

Under the previously effective Proclamation 20-19.6, the eviction moratorium applied for all unpaid rent accruing on or after February 29, 2020. Proc. 20-19.6, ¶ 35. A landlord or property manager could not treat any unpaid rent as an enforceable debt if it accrued after this point as a result of the COVID-19 pandemic. *Id.* That prohibition was caveated with the following provision:

> This prohibition does not apply to a landlord, property owner, or property manager who demonstrates by a preponderance of the evidence to a court that the resident was offered, and refused or failed to comply with, *a re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident*; failure to provide a reasonable repayment plan shall be a defense to any lawsuit or other attempts to collect.

*Id.* (emphasis added). At the time, the Washington State Attorney General's Office prepared assistive materials, including an unpaid rent repayment plan worksheet, to assist landlords and property managers in communicating with tenants to establish such repayment plans.

In this case, the Court finds the eviction moratorium is not impermissibly vague and does not violate the void for vagueness doctrine. Plaintiffs' due process claim fails outright because the contested provision is not a prohibition and does not require them to do anything. *See Grayned*, 408 U.S. at 108 ("It is a basic principle of due process that an enactment is void for vagueness if its *prohibitions* are not clearly defined.") (emphasis added). The moratorium's actual prohibition is

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 37**

indisputably clear: landlords and property managers may not treat unpaid rent stemming from the COVID-19 pandemic as an enforceable debt during the state of emergency. Plaintiffs' complaint concerns the exception to the prohibition, which the state constructed to *permit* enforcement proceedings in narrow circumstances: that is, where a landlord and tenant have established a repayment plan that was "reasonable based on the individual financial, health, and other circumstances of that resident." Proc. 20-19.6, ¶ 35; *see also* Proc. 21-09, ¶¶ 42–45. This provision, which permits rather than prohibits a particular remedy, is not properly challenged under the vagueness doctrine.

Further, even if this exception constituted a "prohibition" and fell within the scope of the vagueness doctrine, the moratorium is not vague as applied to Plaintiffs. Plaintiffs have failed to demonstrate that the eviction moratorium in either its previous or current form is impermissibly vague as applied to them.[4] Plaintiffs' vagueness claim is directly undermined by the fact that at least two Plaintiffs have managed to create repayment plans with tenants. During implementation of the former moratoria, which provides slightly less substantive guidance on establishing repayment plans, Plaintiff Jay Glenn attested that, for example, one tenant owed $3,000 in past-due rent and offered to pay $120 per month after moveout, which he accepted as reasonable. And under the operative Bridge Proclamation, such a plan is *plainly* reasonable if the schedule does not "exceed monthly payments equal to one-third of the monthly rental charges during the period of accrued debt." Proc. 21-09, ¶ 43. Provided that a devised schedule does not exceed this threshold, landlord and property managers may seek reimbursement if a tenant defaults under the repayment plan. Because of this, the Court cannot find that the repayment plan provision does not provide a person of

---

[4] Plaintiffs do not contend that their First Amendment rights are implicated, and therefore heightened scrutiny does not apply.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 38**

ordinary intelligence fair notice of what is permitted (or prohibited) or that it encourages seriously discriminatory enforcement. *See Williams*, 553 U.S. at 34. Plaintiffs have failed to demonstrate that there is no set of circumstances where the law as applied would be valid, and their facial attack is unsuccessful. *See Salerno*, 481 U.S. at 745; *Castro*, 712 F.3d at 1311. Accordingly, Plaintiffs' claim that the eviction moratorium is unconstitutionally vague fails as a matter of law, and summary judgment on this claim is granted to Defendants.

2.  Whether the Eviction Moratorium Violates Plaintiffs' Substantive Due Process Rights

a.  *Legal Standard*

The right to use property as one wishes is not a fundamental right under substantive due process, as it is economic in nature. *Slidewaters LLC v. Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021); *Bowers v. Whitman*, 671 F.3d 905, 915–17 (9th Cir. 2012). "The proper test for judging the constitutionality of statutes regulating economic activity . . . is whether the legislation bears a rational relationship to a legitimate state interest." *Jackson Water Works, Inc. v. Pub. Util. Comm'n of Cal.*, 793 F.2d 1090, 1093–94 (9th Cir. 1986). "Legislative acts that do not impinge on fundamental rights or employ suspect classifications are presumed valid, and this presumption is overcome only by a 'clear showing of arbitrariness and irrationality.'" *Slidewaters LLC*, F.4th at 758 (quoting *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994)). The U.S. Supreme Court has "long eschewed" a heightened standard of scrutiny when addressing substantive due process challenges by government regulation. *Lingle*, 544 U.S. at 542; *see also Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("We have returned to the original constitutional proposition [pre-*Lochner*] that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."). Instead, federal

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 39

courts must defer "to legislative judgments about the need for, and likely effectiveness of, regulatory actions." *Lingle*, 544 U.S. at 545.

Accordingly, to determine whether the eviction moratorium violates Plaintiffs' substantive due process rights, the Court must first determine whether the law could advance any legitimate government purpose. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994). Second, the Court must determine whether the law is arbitrary and irrational. *See Lingle*, 544 U.S. at 542; *Slidewaters LLC*, 4 F.4th at 758. This is akin to a rational basis standard of review, *see Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124–25 (1978), and is a "less searching" standard than that utilized in a constitutional challenge under the Contracts Clause, *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

Furthermore, the U.S. Supreme Court has made clear that a substantive due process claim must give way to a claim based on identical facts that is derived from "an explicit textual source of constitutional protection." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Albright v. Oliver*, 510 U.S. 266, 266, 273 (1994) (four-Justice plurality), *id.* at 281 (Kennedy, J., concurring); *Stop the Beach Renourishment, Inc.*, 560 U.S. at 721 (Kennedy, J., concurring).

b.  *Discussion*

In this case, the Court finds that Plaintiffs' Contracts Clause claim supersedes their substantive Due Process Clause claim. Plaintiffs' substantive due process claim is identical to their cause of action under the Contracts Clause, which the Court has already adjudicated. The Contracts Clause provides "an explicit textual source of constitutional protection" and Plaintiffs may not repackage their identical argument into an independent due process claim. *See Graham*, 490 U.S. at 395.

Further, Plaintiffs' property-based substantive due process claim employs a lower standard of scrutiny than that employed under their Contracts Clause claim.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 40**

The Court already determined that, under Contracts Clause analysis, the eviction moratorium is an appropriate and reasonable fit to a significant and legitimate purpose of the state. The moratorium is not unduly oppressive to Plaintiffs' due process rights or arbitrary and irrational for the same reasons it is an "appropriate" and "reasonable" regulation under the Contracts Clause. *Accord Blaisdell*, 290 U.S. at 448. As a result, the Court grants summary judgment to Defendants on Plaintiffs' substantive due process claim.

## V.    Conclusion

For the foregoing reasons, this Court holds that the Washington's eviction moratorium does not violate the Takings Clause, Contracts Clause, or Due Process Clause of the U.S. Constitution. The state government can, should, and must protect the public's health and safety during a pandemic to mitigate transmission of a novel and potentially fatal pathogen, as the State of Washington has done in the past nineteen months to combat the COVID-19 pandemic. The people of Washington, all of us collectively, can, should, and must protect ourselves, but also one another, during the pandemic. This worthy objective includes protecting the most vulnerable individuals in our state. The eviction moratorium is part of the emergency efforts implemented by the duly elected governor of the State of Washington, whose role is to exercise his powers and responsibilities to protect the people from the COVID-19 pandemic and protect the economy of the state. These aims were appropriately realized through implementation of Washington's eviction moratorium.

//

//

//

//

//

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . * 41**

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendants' Cross-Motion for Summary Judgment, ECF No. 30, is **GRANTED**.

2.    Plaintiffs' Motion for Summary Judgment, ECF No. 22, is **DENIED**.

3.    The District Court Executive is directed to enter judgment in favor of Defendants and against Plaintiffs.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order, provide copies to counsel, and **CLOSE** the file.

**DATED** this 20th day of September 2021.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT . . . \* 42**